**Robert H. BURACK**

v.

**The UNITED STATES.**

**No. 94–67.**

United States Court of Claims.
June 16, 1972.

---

2. Bureau of Naval Personnel Manual, 1942, Ch. 6, Leave, C–6001(7) as cited in 145 Ct.Cl. at 529, 172 F.Supp. at 449.

Stanley P. Wagman, New York City, attorney of record, for plaintiff.

Michael H. Singer, New York City, with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant; Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on February 23, 1972. No exceptions or brief pertaining to the opinion and report were filed by the parties and time for so filing pursuant to the Rules of the court has expired. On April 14, 1972, defendant filed a motion that the court adopt the commissioner's report and dismiss plaintiff's petition to which no timely response has been filed. Since the court agrees with the trial commissioner's

opinion, in which the facts are fully stated, and his recommended conclusion of law, as hereinafter set forth, it hereby grants defendant's motion and adopts them as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER

GAMER, Commissioner:

Section 6672 of the Internal Revenue Code of 1954 (26 U.S.C. § 6672 (1970)) provides that if a "person" is "required" to collect and pay over certain taxes but "willfully fails" to do so, he shall be penalized by being made liable himself for the amount of such unpaid taxes.[1] Section 6671(b) includes in the definition of such a person an officer or employee of a corporation who "is under a duty" to so collect and pay over.[2]

Plaintiff was the vice-president of a New York corporation which carried on its business at White Plains, New York, under the name of Allied-Hutchinson Co., Inc. The corporation was required to withhold from the wages of its employees certain amounts in respect of the employees' income tax liabilities, as well as amounts representing their obligations under the Federal Insurance Contributions Act. For the first quarter of

1961, the corporation withheld but failed to pay over to the Internal Revenue Service such so-called payroll or employment taxes, and, in 1965, plaintiff was, under the above two Code sections, assessed for the amount the corporation owed for such quarter. In 1966, plaintiff paid the amount in question, plus interest, and in 1967, filed a timely claim for refund thereof, which was denied. Plaintiff sues to recover such assessed amount, plus interest.

■ To be liable, plaintiff's position with the corporation and his duties must have been such that he had "the responsibility and authority to avoid the default * * *," but willfully failed to do so. Scott v. United States, 354 F.2d 292, 296, 173 Ct.Cl. 650, 657 (1965). Plaintiff contends that, although he was the vice-president, the part he played in the corporation's affairs was not such as to have made him such a responsible person with the requisite authority and that, in any event, he did not "willfully" fail to pay the withheld taxes involved. It becomes necessary, therefore, to consider how the defaulting corporation operated and what were plaintiff's duties and activities therein.

Allied-Hutchinson Co., Inc., was an unusual corporation whose active, operating life lasted only approximately two years, from June 1959 to July 1961. It

---

1. The pertinent provisions of the section are as follows:

§ 6672. *Failure to collect and pay over tax, or attempt to evade or defeat tax.*

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. * * *

2. The section's pertinent provisions are as follows:

§ 6671. *Rules for application of assessable penalties.*

(a) *Penalty assessed as tax.*

The penalties and liabilities provided by this subchapter shall be paid upon notice and demand by the Secretary or his delegate, and shall be assessed and collected in the same manner as taxes. Except as otherwise provided, any reference in this title to "tax" imposed by this title shall be deemed also to refer to the penalties and liabilities provided by this subchapter.

(b) *Person defined.*

The term "person", as used in this subchapter, includes an officer or employee of a corporation * * * who as such officer * * * is under a duty to perform the act in respect of which the violation occurs.

represented a combination of two separate corporate interests, and came into being in the following described manner.

I. Burack, Inc., is a New York corporation successfully engaged, since 1931, in the wholesale plumbing, heating, oil burner, and electrical supply business. During the 1959–1961 period here pertinent, it had gross sales of approximately $10,000,000, was servicing 1,200–1,500 customers, and had excellent banking connections and contacts with large building contractors. Plaintiff, the corporation's treasurer, was in general charge of the corporation's operations, was the officer who was in direct contact with customers and suppliers, and was familiar with the corporation's financial affairs, being in close touch with the corporation's bankers and the official who signed the corporation's tax returns. There were only three stockholders, i. e., plaintiff, his brother Abraham W. Burack, and his brother-in-law Solomon Jaffe, but plaintiff was the corporation's principal officer and employee.

The Hutchinson Roofing & Sheet Metal Company (hereinafter the Hutchinson Company) was also a New York corporation organized in 1931. It was engaged in the business of supplying and installing fabricated sheet metal used in ventilation (air-conditioning and heating) components of structures. It too was a close corporation owned and operated by Max Radding, his son Joseph, his son-in-law George Goldstein, and one Edward Kleinberg.

Following some earlier business dealings between the Burack corporation and the Hutchinson Company, there had developed, by early 1959, a close personal friendship between Joseph Radding and plaintiff. At that time, Joseph Radding told plaintiff that the Hutchinson Company was negotiating for an approximately $800,000 subcontract for the sheet metal work on an International Business Machines project to be located in Yorktown Heights, New York, but that he doubted that the Company had the necessary financial resources to enable it to handle what would be for it such a large undertaking. Since the Burack corporation had good banking connections, he suggested the possibility of the IBM subcontract being undertaken as a joint venture between the Hutchinson Company and the principals of the Burack corporation. The Burack corporation principals also owned a corporation operating under the name of Allied Industrial Manufacturing Corporation, and the discussions included the possibility of a joint venture composed of the Hutchinson Company and Allied Industrial. Upon consideration, however, the Burack principals decided against a joint undertaking with the Hutchinson Company interests by any of their corporations.

Nevertheless, further discussions did evolve the idea of forming a new corporation in which the Hutchinson Company and the Burack interests would have equal stock ownership. This corporation would be in the same business as the Hutchinson Company and would perform the IBM subcontract and such other sheet metal subcontract business as it could procure. The new proposed corporation would operate from the same premises as the Hutchinson Company, and its contracts would actually be performed by such Company, which had the know-how and the necessary facilities. The objective was to combine the Hutchinson Company's facilities and technical ability in its specialized field with the good credit of the Burack interests, as well as their contacts with large building contractors, which, it was hoped, would be productive of business.

Both sides agreed to such a plan and, in June 1959, the new entity designed to effectuate it was organized as a New York corporation with the name of Allied-Hutchinson Co., Inc. (hereinafter "Allied"). To carry out the design of equal stock ownership between the Burack and the Hutchinson Company interests, the subscribers to Allied's stock were plaintiff, Abraham Burack, and Jaffe, each with a 16⅔ percent interest (totaling 50 percent) and the Hutchinson Company, with a 50 percent interest.

Apparently because the new corporation needed no facilities or independent quarters, or any employees of its own, it being the Hutchinson Company that would house it and execute its contracts on a 100 percent type subcontract arrangement, the total capitalization was the surprisingly small amount of $500, which amount was its only initial asset.

Nevertheless, the new corporation did obtain the sheet metal subcontract, in the amount of $790,000, on the IBM project, and plaintiff was instrumental in obtaining from the Royal State Bank of New York City, a bank with which the Burack corporation had financial connections, a line of credit for the corporation, the loans thereunder being secured, in accordance with a loan agreement between the corporation and the bank, by an assignment of the corporation's accounts receivable. In July 1959—the month after Allied was organized—the bank lent Allied over $140,000 against assigned accounts receivable which at that time related only to the subcontract on the IBM project. The prime contractor on that project was the William L. Crow Construction Company, which subcontracted the mechanical work to a joint venture composed of A. D. Walker, Inc., and the J. E. Schechter Corporation, such joint venture in turn subcontracting the sheet metal work to Allied.

The new corporation's officers (all of whom were also its directors) consisted of Joseph Radding, president, plaintiff, vice-president, Jaffe, secretary, and Goldstein, treasurer. It was understood that Joseph Radding would manage its day-to-day operations. However, pursuant to an arrangement entered into with the bank, it was agreed that one person from the Hutchinson Company group, i. e., either Joseph Radding or Goldstein, and one person from the Burack group, i. e., either plaintiff or Jaffe, had to sign the corporate checks before payment would be made by the bank. It

was in fact plaintiff who cosigned all of Allied's checks.[3]

For a while, matters apparently went well. In addition to the IBM subcontract, Allied obtained, in August 1959, a $460,000 subcontract on a project at the McGuire Air Force Base in New Jersey, and, in February 1960, a $152,000 subcontract on the Morgan Annex of the General Post Office in New York City.

Since Allied initially had no employees of its own, with its contracts being carried out by a kind of informal subcontract arrangement with the Hutchinson Company, intercompany charges were made, allocations being made by the Hutchinson Company, where its employees, equipment, and materials were used on Allied contracts, for labor, overhead, equipment, and materials. As advances against an anticipated future accounting, Allied would regularly issue checks to the Hutchinson Company in lump-sum amounts, and the Company would pay its employees and materialmen directly. Allied's books had been initially opened and kept by Jaffe, but, to facilitate the recordkeeping with respect to the intercorporate accounts, of which only the Hutchinson Company personnel had the requisite knowledge and data, all the books and records were transferred to the Hutchinson Company's premises on February 1, 1960, where they were thereafter maintained by the Hutchinson Company employees under the supervision of the Raddings and the Company's office manager. As stated, the Hutchinson Company premises also served as Allied's office location.

Until his untimely death in early April 1960, Joseph Radding, as president, managed the operations of the new corporation. Thereafter, his father, Max Radding, succeeded to the presidency and took over the management.

Up to October 1960, plaintiff, although primarily concerned with the operations of the Burack corporation, the

3. Except for one instance wherein a check, signed by only one person representing the Hutchinson Company interests, was, apparently by error, honored by the bank.

handling of which was time-consuming, nevertheless, by regular visits to Allied's offices at the Hutchinson Company premises and discussions with the Raddings, kept himself informed about Allied's affairs. At such visits, plaintiff cosigned Allied's checks. Through his contacts with building contractors, he attempted to obtain, and was instrumental in obtaining, business for Allied. Prospects would be referred to the Raddings, who prepared all estimates, executed the contracts, did all the hiring and purchasing, and otherwise managed Allied's day-to-day operations.

After Joseph Radding's death, plaintiff began to have misgivings about Allied's future. For one thing, it became clear that Max Radding had no intention of phasing out the Hutchinson Company's activities and permitting Allied to be the sole surviving company in an expanded sheet metal business such as his son Joseph and plaintiff had envisioned. At one time he requested plaintiff to cease attempting to obtain further new business for Allied, which, he felt, already had more than could be handled. Radding did, in fact, reject some new business prospects which plaintiff had referred to him. Plaintiff later concluded, however, that Radding had accepted some of this work in the Hutchinson Company's name.

In addition, commencing in July 1960, Radding complained about Allied's lack of sufficient funds to meet payrolls. Allied issued weekly checks to the Hutchinson Company for payroll reimbursement, but they were insufficient to cover the applicable employment withholding and social security taxes. The bank loans, which were limited to a percentage of the assigned accounts receivable, were insufficient for the purpose. On July 15, 1960, the Burack corporation lent Allied $5,000. The following month, it lent another $5,000, and an additional $7,000 the next month. However, these loans were made in the form of an exchange of checks, the Allied reimbursement checks (cosigned by plaintiff) being dated as of a date later

than the Burack corporation checks, and the loans were in fact so repaid. Nevertheless, despite plaintiff's repeated requests for an accounting statement which would show the status of the Allied-Hutchinson Company intercompany accounts, and which would give some indication of Allied's financial health, no such accounting was forthcoming. Max Radding's explanation of his failure to furnish any accounting or financial statements showing the status of Allied's operations was his dissatisfaction with the services of the accountant who theretofore had been performing the accounting work for the Hutchinson Company. He had, therefore, not retained any accountant to audit Allied's books and records. Plaintiff thereupon suggested that the Burack corporation's longtime accountant, Mr. Louis Weiner, be retained by Allied. Radding assented, and, in September 1960, Weiner commenced his audit and the preparation of an Allied financial statement. Weiner promptly concluded, and so reported to plaintiff and Jaffe, that there were certain errors in the Allied records which purported to reflect the intercompany accounts. For instance, he construed the records as indicating that Allied had, in one instance, paid for certain materials that had actually been used by the Hutchinson Company on one of the Company's own projects. In another instance, he felt that the Hutchinson Company had charged Allied for the cost of certain materials that Allied had previously purchased and for which it had already paid.

Finally, in early October 1960, on one of his visits to Allied's office in the Hutchinson Company's premises, Max Radding and plaintiff came to a personal parting of the ways. After examining certain records, plaintiff concluded that the Hutchinson Company, on still another one of that Company's projects, was wrongfully charging Allied for labor and material costs. Upon plaintiff's insistence that reimbursement be made to Allied for this alleged wrongful diversion of Allied's funds, a heated argu-

ment followed between Max Radding and plaintiff, after which plaintiff left the office, ceased any further verbal communication with Radding, and made no further regular visits to the Allied office.

Shortly thereafter, at the insistence of the Burack interests and to carry out their decision that Allied should have control over its own expenditures, a system was instituted whereby Allied would pay its expenses directly rather than reimbursing the Hutchinson Company, by lump-sum payments against future accountings, for that Company's costs in carrying out Allied's jobs. Thereafter, Allied itself maintained separate payrolls for the on-the-job workers on its contracts as well as for the fabricators employed at the Hutchinson Company premises, and became directly liable for the withholding taxes on such payrolls, which would be paid by an Allied check requiring plaintiff's signature. Nevertheless, the Hutchinson Company continued to provide Allied's office requirements, Allied's books continued to be kept by Hutchinson Company employees under the supervision of that Company's chief bookkeeper, and Allied's checks continued to be drawn at the direction of Radding for his and plaintiff's cosignatures. Since plaintiff refused to come to Allied's office at the Hutchinson Company's premises while Radding was there, the Allied checks were brought to plaintiff's office for his cosignature at the Burack corporation by the Hutchinson Company's chief bookkeeper, at which time plaintiff would make inquiry about Allied's affairs. The payroll checks were made out in blank. The payees on the other checks were filled in beforehand. However, during late 1960, Max Radding became ill and was absent from the office. In his absence, Goldstein, as Allied's treasurer, and an authorized cosigner, signed Allied's checks in Radding's place, and during this period plaintiff did visit the Allied office several times, cosigned the corporate checks there, and conferred with the personnel about Allied's affairs. Allied's need for funds was a continuing one, and in November 1960, the Burack corporation, by the check-exchange mechanism, lent Allied over $11,000 and the following month, another $15,000, both loans being repaid (by checks cosigned by plaintiff). Commencing in December 1960, Jaffe, by the same method, also began making personal loans to Allied for payroll needs. In December 1960, he lent Allied $3,500; in February 1961, $5,800; and $2,000 and $2,660 in March and April 1961, respectively. Except for a relatively small amount, these loans too were repaid (also by checks cosigned by plaintiff). On one occasion, to alleviate Allied's need for funds, the Hutchinson Company attorney enlisted plaintiff's aid in collecting funds owed by the mechanical subcontractor on the IBM project, and plaintiff discussed the situation with the mechanical subcontractor. On several other occasions, plaintiff discussed Allied's affairs with the attorney.

Allied's income tax return for its initial year of operations—its fiscal year ended June 30, 1960—was, after two extensions of time, filed in March 1961. The return was prepared by Weiner, as was a balance sheet and a profit and loss statement as of June 30, 1960. Such balance sheet and statement were submitted to plaintiff and Jaffe in March 1961. The profit and loss statement showed a small operating loss of some $1,200. The balance sheet showed liabilities exceeding assets, but also by the relatively small amount of around $700. Nevertheless, the assets included accounts receivable of over $320,000, and, naturally, solvency largely depended upon collecting such large amount. Accounts payable to the Hutchinson Company totaled almost $95,000. No intercorporate adjustment not accepted by Radding was made. Plaintiff and Jaffe disputed the large amount shown as owing to the Hutchinson Company, but because Allied's books and records (kept by the Hutchinson Company employees) actually reflected such an indebtedness, Weiner felt obliged to in turn reflect it on the balance sheet. On both the bal-

ance sheet and the income statement Weiner noted, however, that they merely reflected what the books and records showed, that the receivables shown had not been verified, and that the "inventory" figure, included in the assets, was a figure submitted by Allied's management and had not been verified.

Of greater concern to plaintiff at this time in early 1961 was Allied's then current financial status instead of its status as of the end of June 1960 as shown by the Weiner balance sheet and income statement, for in early 1961 plaintiff was advised (by the Royal State Bank) that the Hutchinson Company was then claiming that Allied's indebtedness to it had increased to $240,000. Although plaintiff denied that such a large indebtedness existed, plaintiff was advised by Weiner (who at that time had also been retained as the Hutchinson Company's accountant) that the Allied books did in fact show such an indebtedness to the Hutchinson Company. In addition, both Allied and the Hutchinson Company had, from October through December 1960, made purchases from the Burack corporation and during early 1961, their unpaid bills totaled $13,000 and almost $35,000, respectively. Knowing of Allied's financial difficulties (and apparently the Hutchinson Company's), plaintiff did not press for payment.

On April 30, 1961, Allied, by Max Radding, filed with the Internal Revenue Service the "Employer's Quarterly Federal Tax Return" for the quarter ended March 31, 1961, showing a total liability for federal income tax withholdings from wages and Federal Insurance Contributions Act (FICA) taxes in the amount of almost $37,000, but no payment was made with the return. On May 19, 1961, Allied was assessed in such amount, a federal tax lien being placed on Allied's assets, including the amount owed to Allied in respect of the IBM project, on July 21, 1961. In that

month, Allied was placed in bankruptcy by its creditors and its operations thereupon ceased. A final balance sheet and income statement, i. e., as of July 31, 1961, prepared by Weiner showed total Allied assets of some $216,000, but liabilities of over $447,000, including indebtedness to the Hutchinson Company of over $186,000.[4]

■ Plaintiff contends that it was the Raddings who ran Allied; that he knew little about its affairs; that this was especially so during the first quarter of 1961 (the tax delinquency period here involved), a period when, as a result of his argument with Max Radding in October 1960, he no longer visited Allied's offices; that, as a result of cursory inquiry, he was actually under the impression that Allied's financial affairs were in satisfactory shape; that his cosigning during such period of Allied's checks, which were drawn at Max Radding's direction, and some of which were even presented to him in blank, was perfunctory; and that he did not know that the taxes here in question had not been paid, reliance being placed on Radding and the Hutchinson Company employees, who kept the Allied books and records, to see that they were paid.

The record, however, as indicated by the facts hereinabove detailed, does not permit the acceptance of these contentions. As shown, plaintiff did not, after his dispute with Radding, disassociate himself from Allied's affairs. Both the Burack corporation and Jaffe continued to make loans to Allied. These loans were made principally for the purpose of payrolls and paying over employment tax withholdings. Both before and after the argument, Radding was complaining about Allied's lack of funds to defray such withholding tax liabilities. Verbal contact between Radding and plaintiff may have ceased, but Jaffe, plaintiff's close business associate, still maintained such contact. And plaintiff's contacts

4. The Burack interests were claiming, however, that there was no such indebtedness by Allied to the Hutchinson Company and that, in fact, the Company was indebted to Allied in the sum of over $255,000.

continued with such other informed persons as the employee in charge of keeping Allied's books and records, who brought to plaintiff the Allied checks for his signature; the Allied accountant who, during the very period here involved, furnished plaintiff with an Allied balance sheet and income statement; and the Hutchinson Company attorney, who enlisted plaintiff's aid on Allied's financial affairs. Plaintiff knew of the Jaffe loans to Allied during the very period involved, and, indeed, signed the Allied repayment checks. And during such period, he was in touch with the Royal State Bank about Allied's financial status. As vice-president of Allied, he still performed the vital function of cosigning all of Allied's checks. The question of whether a particular corporate officer or employee is one who had the responsibility and authority to avoid the default depends, of course, upon the sum total of the particular facts involved in the individual case, but there can be no question that plaintiff, as vice-president, as a cosigner of the corporate checks, and as hereinabove shown, an important and knowledgeable Allied official, falls well within the definition of such a responsible person as established by the cases. White v. United States, 372 F.2d 513, 178 Ct.Cl. 765 (1967), and cases cited therein.

■ Plaintiff emphasizes the powers, duties, and functions of the Raddings, their responsibility for the day-to-day operations and carrying out of the contracts because of their technical knowledge, their supervision of the books and records, their directions as to the checks that should be drawn, their execution of Allied's tax returns, etc. But to be a responsible person or officer under the statute, one does not have to be the sole such person or have "exclusive control over all corporate affairs * * *." Scott v. United States, supra, 354 F.2d at 296, 173 Ct.Cl. at 657. The fact that the Raddings may also have qualified as responsible officers does not acquit plaintiff. The Raddings may have given directions as to what checks should be drawn to pay which creditors, but those checks were worthless without plaintiff's cosignature. Authority to cosign in effect gives one the authority to decide which creditors should be paid. Plaintiff may not have participated in the preparation of the checks, but he had the power to prevent disbursement of funds except to appropriate creditors, and there can be no question that he had as much power and authority as the Raddings to direct to whom checks should be drawn. What is essentially involved is " * * * a search for a person with ultimate authority over expenditures of funds since such a person can fairly be said to be responsible for the corporation's failure to pay over its taxes." White v. United States, supra, 372 F.2d at 517, 178 Ct.Cl. at 772.

■ Plaintiff further defends by claiming that, even if he was a responsible person, his default was not "willful," as the statute requires it to be.

■ It is true that "[r]esponsibility without willfulness is not enough." McCarty v. United States, 437 F.2d 961, 967, 194 Ct.Cl. 42, 53–54 (1971). However, in the sense here used, willfulness does not involve an intent to defraud or deceive, or anything in the nature of an evil motive. Bloom v. United States, 272 F.2d 215, 223 (9th Cir. 1959), cert. denied, 363 U.S. 803, 80 S.Ct. 1236, 4 L.Ed.2d 1146 (1960). Instead, as the court in Monday v. United States, 421 F.2d 1210, 1216 (7th Cir.), cert. denied, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 484 (1970), defined the term in the instant statutory context—a definition which this court accepted in *McCarty* —" 'An act is willful if it is voluntary, conscious, and intentional.' " If the officer or employee " 'knowingly used available funds to prefer other creditors over the United States * * * he acted willfully.' " [*Id.*] This test, the court held, places strong strictures even upon such considerations as "reasonable cause" or "justifiable excuse."

The situation here falls within this accepted definition. During the first quarter of 1961, plaintiff knew of Allied's financial difficulties. He knew of Jaffe's loans to Allied during such quarter to meet payrolls. The Burack corporation itself had made similar loans to Allied during the previous quarter for the same purpose, which had been a continuing problem. During that quarter, plaintiff discussed Allied's finances with its accountant and bankers. Plaintiff was fully familiar with payroll tax requirements. He executed all such tax returns for his own Burack corporation. He cosigned the Allied check to the Internal Revenue Service for the quarter previous to the one here involved. He must have known there was no such comparable payment for the quarter in question. Instead, during that quarter, he consciously signed checks to Jaffe in repayment of his personal loans to Allied for payroll purposes. There is no controversy about the fact that during the quarter, Allied had enough funds to pay the taxes shown by the return as due, but that these funds, through Allied checks cosigned by plaintiff, were used to pay other creditors. Indeed, during that quarter Allied received funds from all sources totaling approximately $230,000 and it did meet its net payroll requirements. Plaintiff's excuses that he in fact did not know that the checks he was signing failed to include payment to the Internal Revenue Service for the quarter's employment taxes; that he simply relied on others to take care of the matter; that he signed the checks, some even in blank, in a cursory and perfunctory manner; that he had become disillusioned with the whole venture, was paying little attention to it, and intended to sever himself from it at the earliest propitious opportunity— even if all true—simply amount to injecting considerations of alleged "reasonable cause" or "justifiable excuse" elements into the definition of willfulness of a type which this court, in *McCarty*, rejected. Under the circumstances here involved, plaintiff's failure, where he had the requisite power and responsibility within the corporate structure, to see that the taxes were in fact paid, constituted willfulness within the meaning of the statute.

Plaintiff was an influential, active, officer in determining the corporation's financial policies and procedures. It was on plaintiff's insistence, shortly after his argument with Radding, that the entire manner of Allied's paying its expenses was changed, Allied thereafter making such payments directly, maintaining its own separate payrolls, and itself becoming liable for the payroll taxes (instead of making lump-sum payments to the Hutchinson Company against prospective future accountings). During the very quarter here involved, it was plaintiff who was consulted by the Royal State Bank about the corporation's alleged indebtedness to the Hutchinson Company, and it was plaintiff who conferred with the corporation's accountant about the matter and caused the accountant to effect a cautionary note in the Hutchinson Company statement to the bank with respect to such alleged indebtedness. If plaintiff did indeed sign the corporation's checks perfunctorily and without inquiry, knowledge, or interest during the first quarter of 1961, despite his having effected a recent drastic change in the method of Allied's operations relating to its maintenance of separate payrolls and its paying its expenses directly, then he acted not only wholly out of character but also, in view of his conclusion that the Radding interests had been responsible for wrongful diversions of Allied's funds, in reckless disregard of the interests of both Allied as a corporation and of the Burack stockholders, whose interests he had a special mandate to protect. A corporate officer charged with safeguarding financial interest should not, by a deliberate disregard of duties and responsibilities associated with such actually exercised power as signing all corporate checks, be able to defeat the statutory liability fixed upon responsible persons by pleading that he did not know what

he was signing and that his action was therefore not "willful."

■ Plaintiff further contends that the assessment against him is invalid because it was made in violation of an Internal Revenue Service agreement to forego making any such assessment.

This contention too is unsupported by the record.

There is no written agreement which forms the basis for the contention. Instead, plaintiff relies upon an understanding he claims was reached between Jaffe and certain IRS attorneys at a meeting held at the IRS Regional Counsel's Office in New York City on January 24, 1963. Plaintiff did not attend this meeting. Although Jaffe did, it can only be concluded that if Jaffe construed what evolved from such meeting as constituting any such understanding, there was a clear misunderstanding on Jaffe's part.

Prior to this meeting, the IRS began taking active steps to collect the delinquent employment taxes that both Allied and the Hutchinson Company owed. The most fruitful immediate asset available for such payment appeared to be a sizable amount—over $100,000—claimed by Allied to be due to it from the mechanical subcontractor on the IBM project, and in turn, claimed by the Hutchinson Company to be due to it from Allied for actually performing the work.

Understandably, there was a considerable scramble for these funds by those of Allied's creditors who considered themselves to be in a secured or preferred position. In June 1961 (prior to Allied's bankruptcy), the Royal State Bank advised the mechanical subcontractor of the assignment of Allied's accounts receivable which it held and requested that all future payments of moneys owed to Allied be made directly to the bank. By letter of June 24, 1961, Allied requested the mechanical subcontractor to honor the bank's request. However, as hereinabove set forth, on July 21, 1961, the IRS placed a tax lien on such funds owed to Allied in the amount of approximately $37,000, *i.e.*, Allied's indebtedness for the first quarter of that year. The following month, after Allied was placed in bankruptcy, the Hutchinson Company filed a $112,000 mechanic's lien against IBM, the mechanical subcontractor, and Allied. It then assigned the lien to the Royal State Bank. Needless to say, the funds were by this time quite effectively tied up, and IBM and the mechanical subcontractor, pending a determination of entitlement, refused to pay any of the claimants.

The matter was further complicated by a dispute between the mechanical subcontractor on the one hand and Allied (and the Hutchinson Company) on the other as to the correct amount of the balance due. These parties finally agreed upon a settlement of some $70,000.

Over a year after the Hutchinson Company had placed a mechanic's lien on the IBM funds, the funds were still tied up, and both Allied and the Hutchinson Company were still indebted to the IRS, but in even larger amounts with respect to their employment taxes, the former in the amount of almost $55,000, and the latter in the amount of over $32,000 (for both the third quarter of 1960 and the second quarter of 1962). On September 20, 1962, a meeting was held at the IRS Regional Counsel's Office in New York City to see what could be done with respect to releasing the IBM funds. In attendance were Radding in his capacity as president of both Allied and the Hutchinson Company, as well as attorneys representing the Hutchinson Company, the Royal State Bank, the mechanical subcontractor, and the IRS. At the meeting, both the bank, by reason of its earlier assignments, and the IRS, by reason of its tax liens (which had also been placed on the funds with respect to the Hutchinson Company tax debts) claimed priority. Each side, however, pointed to alleged weaknesses in the other's position. The bank, to its consternation, discovered that it had failed to make the necessary recordations of any

of its prior assignments. But, although the IRS had filed with the mechanical subcontractor a notice of levy against Allied, it had failed to so file such a notice with respect to the Hutchinson Company. Further discussions considered whether the moneys belonged to Allied or the Hutchinson Company, and the effect of the New York Lien Law as it related thereto. Finally, the attorney for the bank stated that the bank would not object to the paying over to the IRS of the tax amount owed by the Hutchinson Company provided the IRS discharged its tax lien against the balance. Before arriving at a decision, however, the IRS attorneys desired more data, although they did indicate that, assuming the further information to be submitted to them was satisfactory, they would, upon payment to the IRS of the $32,000 owed by the Hutchinson Company, make favorable recommendations for a discharge of the property in question from the effects of the federal tax liens.

Shortly after the meeting, the Hutchinson Company, on October 15, 1962, filed an application for the discharge of the tax liens that had been placed on the IBM funds. The application stated that a settlement in the amount of some $70,000 had been reached by the parties with respect to the amount owed by the mechanical subcontractor, and that if the application was granted, the Hutchinson Company would discharge its mechanic's lien.

At another meeting held on November 14, 1962, attended by the same parties, Radding further agreed to liquidate the Hutchinson Company's currently delinquent employment taxes, i. e., for the third quarter of 1962 (in the amount of around $12,000), by no later than the end of the year, and henceforth to have the Company pay its current tax obligations as they accrued. A payment on account in the amount of $3,000 was made to the IRS the following week.

Thus, the IRS was receiving some tangible results from its attempts to collect the Hutchinson Company's employment tax debt.

With respect to Allied, however, which was still in bankruptcy, there had been no such results. The IRS attorneys, at the meeting on September 20, 1962, had expressed the opinion that, under the New York Lien Law, the entire amount of the IBM funds due on the Allied subcontract in fact belonged to the Hutchinson Company, since it was that Company that had actually performed the work. These attorneys were then not cognizant of the dispute between Allied and the Hutchinson Company as to the status of the intercorporate accounts or as to Allied's contention that it was not indebted to the Hutchinson Company in any amount. It was at the time the customary procedure and policy of the IRS to attempt, by all reasonable methods, to collect delinquent corporate employment taxes from the corporation itself before seeking payment by way of 100 percent penalty assessments against the responsible corporate officers. See McCarty v. United States, *supra*. Under the circumstances, the IRS decided to proceed at that time against plaintiff and Jaffe personally, as allegedly responsible officers of Allied, and, during the latter part of November 1962, sent to them proposed 100 percent penalty assessments. By letter of November 30, 1962, plaintiff (and Jaffe) protested the proposed assessment and requested that a conference be held before any such assessment was made.

Meanwhile, the end of the year arrived and the Hutchinson Company had failed to keep its promise either with respect to liquidating its 1962 third quarter employment tax indebtedness or meeting its current fourth quarter liability. In addition, it was still indebted on its old 1960 employment taxes. By letters of December 27, 1962, to the Company and the Royal State Bank, the IRS threatened drastic action. (Because of the Company's indebtedness to the bank, it was to the bank's advantage that the Company be kept alive as a going concern.) Among other things,

the IRS urged the bank to advance to the Company gross, instead of only net, payrolls so that the Company could meet its current employment tax liabilities. (The bank did thereafter commence advancing gross payrolls to the Company.) Shortly thereafter, the Hutchinson Company, by its attorney, advised the IRS that the Company had decided, with the bank's agreement, that it should effect an orderly liquidation of its business, which, it felt, would permit paying all debtors in full.

Then, some two weeks later, the Hutchinson Company's fortunes received another jolt. It had instituted an action to foreclose the mechanic's lien it had filed, but Allied interposed a defense thereto and, on January 14, 1963, the New York Supreme Court dismissed the suit.

On January 24, 1963, another meeting was held at the IRS Regional Counsel's Office to review the situation with respect to the IBM funds. This time Allied was represented by Jaffe (instead of by Radding). Also present were attorneys representing the Hutchinson Company, the Royal State Bank, and the IRS. The matters considered at the meeting included the dismissal of the mechanic's lien action, the effect, nevertheless, of the New York Lien Law, and the relative priorities of the bank and the IRS. Since the $70,000 of IBM moneys due from the mechanical contractor (which, it was learned at the meeting, was also now in serious financial difficulty) was less than the amounts Allied and the Hutchinson Company together owed either the IRS or the bank, it was felt that, regardless of whether the funds belonged to Allied or to the Hutchinson Company, they would all go either to the bank or to the IRS anyway, depending on the validity of their alleged priorities. The IRS attorneys stated that the IRS would not approve the pending application for the discharge of the federal tax liens unless at least a substantial part of the IBM funds went to defray the outstanding tax liabilities of both Allied and the Hutchinson Company. After further discussion, the attorneys for the IRS and the bank compromised their respective positions by agreeing that the IRS would receive $30,000 of the funds, and the balance of approximately $40,000 would go to the bank.

It was then necessary to determine against which corporate entity's indebtedness—Allied or the Hutchinson Company—the IRS was to apply the $30,000. The IRS attorneys suggested that the entire amount be applied to the credit of the Hutchinson Company, but Jaffe objected to the Company's obtaining anything out of the mechanical subcontractor's payment. The attorney for the Hutchinson Company stated, however, that the mechanic's lien suit was still pending (he had requested a reargument) and that the Hutchinson Company was still claiming the entire payment. Since the funds were still, therefore, tied up and would remain so while the proceedings were pending, both the IRS and the bank urged Allied and the Hutchinson Company representatives to co-operate in agreeing to their release so that some reductions could be effected on their indebtednesses. The IRS attorneys emphasized that, to the extent that the tax liabilities of Allied and the Hutchinson Company were decreased by the disputed fund, to such correlative extent would potential liability of the corporate officers for the 100 percent penalty be reduced. Finally, Jaffe and the Hutchinson Company attorney arrived at an agreement whereby $20,000 of the $30,000 share would be applied to Allied's tax indebtedness and $10,000 to the Hutchinson Company's and the IRS consented to such application.[5]

As to the balance of the corporate liabilities to the IRS and the bank, the Hutchinson Company reiterated the previous understanding that a plan would

---

5. The $10,000 would substantially clear up the Hutchinson Company indebtedness going back to the third quarter of 1960.

be submitted for the orderly liquidation of the Company and that if such liquidation were permitted, which would contemplate the completion of all pending contracts, all remaining indebtedness of both Allied and the Hutchinson Company to both the IRS and the bank would be fully liquidated. On this basis, the IRS attorneys stated that, in accordance with the aforementioned IRS practice and policy, they would, as long as it reasonably appeared that collection of the corporate tax indebtednesses could be made from the corporations themselves, refrain from assessing the corporate officers with the 100 percent penalties. Thus, the assessments which the IRS had notified plaintiff and Jaffe during the previous November it proposed to make, would not, in light of the understandings reached at the meeting, be made for the time being. They further stated, however, that, to avoid such immediate assessments, the officers of both corporations would be obliged to execute waivers of the statute of limitations on the assessment against them of such penalties so that, in the event satisfactory steps would not be taken by the corporations to liquidate their indebtednesses, the IRS would still have recourse against such officers.

Following this meeting, the federal tax liens on the IBM funds were discharged (no further action being taken on the dismissed mechanic's lien suit), $30,000 was paid to the IRS, as agreed, and waivers extending the period of limitations on the assessment of the 100 percent penalties against the corporate officers were executed. Plaintiff's waiver extended the time for such assessment against him to December 31, 1966.

Over a year then passed with no Hutchinson Company liquidation plans being submitted to the IRS, or financial data requested by the IRS with respect to both Allied and the Hutchinson Company being furnished. A couple of small payments [6] were made with respect to the Allied indebtedness for the first quarter of 1961, but, excluding the $20,000 application from the IBM funds that had been made the previous year, there had been no substantial reduction. As of September 1, 1964, almost $20,000 still remained owing with respect to such 1961 first quarter. Accordingly, IRS decided to proceed with the proposed assessments it had issued to plaintiff and to Jaffe in November 1962, and, as they had requested, a conference was held and protests filed. However, as stated, the assessment was subsequently made against plaintiff.

As shown by the above narrative, the record wholly fails to support plaintiff's contention that the Government, recognizing "the vulnerability of its collection status," entered into an oral agreement at the January 24, 1963 meeting with Jaffe that, in consideration of Jaffe's permitting $10,000 of Allied's funds to be applied to the Hutchinson Company's account, "the Government would not assess Allied's deficiency against plaintiff." [7] To the contrary, it was made plain by the IRS attorneys that the Government was reserving its rights in full to proceed against the corporate officers by way of 100 percent penalties but that such proceedings against them would be deferred as long as it appeared that it would be possible for the corporations themselves to liquidate their indebtednesses. The IRS did indeed keep its bargain. Because of the assurances of corporate payment that were given to it at the January 24, 1963 meeting and thereafter, it deferred to March 1965 making the assessment against plaintiff which it had proposed to make in November 1962.[8] If such a nonassessment

---

6. $509.34 made in October 1963, and $1,000 made in June 1964.

7. Brief for Plaintiff to the Commissioner, p. 6.

8. During this period IRS further delayed making the assessments because of advice it received from the Hutchinson Company that there was a possibility that the Company would receive a substantial condemnation award on certain real estate it owned.

agreement had in fact been made on January 24, 1963, as plaintiff now contends, it is not understood why plaintiff, after the meeting, went ahead and executed the waiver extending the time within which an assessment against him could be made without even mentioning such an alleged agreement.[9]

 Finally, plaintiff contends that he should be released from liability because, but for IRS actions, Allied itself could have had its tax liabilities fully liquidated. He relies on McCarty v. United States, *supra*, wherein a corporation officer was held not to be subject to the penalty assessment where the IRS, after placing tax liens on the corporation's assets, failed, subsequent to the Navy's taking over the management and control of the company under a V-loan guarantee agreement, to enforce the liens and otherwise to collect the delinquent withholding taxes from such assets despite a prior agreement between the corporation and the IRS, which the Navy knowingly breached, to pay such delinquent taxes in monthly installments. The IRS specifically agreed with the Navy that the tax indebtedness would be subordinate to the Government loans. Plaintiff says that in the instant case, the IRS similarly frustrated Allied's ability to pay its delinquent taxes by (1) consenting to the disposition of a $112,000 account receivable from the mechanical subcontractor (which was the amount of the mechanic's lien filed by the Hutchinson Company) for only $70,000, a $42,000 difference that would have been sufficient to discharge the balance of Allied's tax liability in full (the assessment against plaintiff herein amounting only to some $20,000); (2) by agreeing to allocate only $30,000 of the reduced $70,000 figure to the tax de-

ficiencies and consenting, despite its tax liens, to the balance going to the Royal State Bank, such differential again being sufficient to liquidate the Allied deficiency in question; and (3) by applying $10,000 of the $30,000 toward the payment of the Hutchinson Company's tax liabilities after it became clear, by the dismissal of the Company's mechanic's lien suit, that the funds in fact belonged wholly to Allied (this ground, if sustained, effecting only a *pro tanto* release).

The foregoing factual narrative again demonstrates the lack of record support for these contentions and the consequent inapplicability of the *McCarty* doctrine.

First, there is nothing in the record to indicate that the IRS was in any way responsible for the agreement that the correct amount of the balance due from the mechanical subcontractor to Allied (and Allied's to the Hutchinson Company with respect to the work performed by the Company on this contract) was $70,000. That agreement was reached by the parties concerned themselves even before the first IRS meeting of September 20, 1962. There is no showing that the IRS had any basis for any knowledge as to how much work had been performed under the contract, the value thereof, or any of the other contract details. Further, the IRS would, naturally, desire that this fund, representing the only immediately available asset from which the obligations to it could be satisfied, be as large as possible. It would hardly exert such influence as it conceivably could have in the matter toward a fund reduction.

 As to the second point, plaintiff makes no showing that the agreement between the IRS and the bank for a $30,000–$40,000 split of the fund was

---

9. In the Protest that plaintiff, over a year later, filed on September 30, 1964, to the proposed assessment, he did take the position that at the meeting an agreement had been reached that, in consideration of the execution by Allied's officers of the waivers of the statute of limitations on the assessment of the 100 percent penalty, the IRS would await the outcome of legal proceedings pending between Allied and the Hutchinson Company and, because such proceedings were still in effect, the proposed assessment was premature. That version of the "agreement," which too is not supported by the record herein, is not here pressed.

in any way improper, unrealistic or not made in good faith. The argument that had the IRS foreclosed on its tax liens, it would have realized sufficient funds to defray all of Allied's tax indebtedness —with no resultant personal liability for plaintiff—fails to take into account the bank's position with its prior assignment of the accounts receivable executed by Allied as security for the loans made by the bank to Allied. While the bank had not recorded this assignment, it had in June 1961—prior to the tax lien of July 1961—specifically notified the mechanical subcontractor of the assignment and requested all future payments of moneys owed to Allied be made directly to the bank. And Allied, by letter of June 24, 1961, requested the joint venture to honor the bank's request. Indeed, had this course been followed, all of the funds would have gone to the bank; there would have been no reduction in Allied's tax indebtedness; and plaintiff would then personally have become liable in an equivalently larger amount. For the court now to accept plaintiff's contention that all of the IBM funds should have gone to the IRS, it would have to make a determination of the priority dispute between the IRS and the bank, a question concerning which the record is wholly insufficient. Furthermore, the $30,000–$40,000 agreed split of the fund was worked out at the January 24, 1963 meeting which Jaffe attended as Allied's representative. There is no indication that Jaffe, who was part of Allied's Burack interests, did not assent to the arrangement or was the victim of any duress or overreaching. Jaffe is an attorney, and, as the record indicates, an able one, as well as an experienced and knowledgeable businessman. As one of only three stockholders in the close Burack corporation (and other related corporations), he handled important aspects of its financial affairs (as well as its legal and accounting problems). At the time of this meeting, IRS had already issued to both plaintiff and Jaffe notices of proposed 100 percent penalty assessments against them. It must be assumed that the agreements made at this meeting, all reached with Jaffe's knowledge and consent, were deemed by him as not being prejudicial to his own, or to plaintiff's similar, interests.

Finally the contention that $10,000 of the $30,000 should not have been applied to the Hutchinson Company's tax indebtedness and that the entire amount should, instead, have been applied to Allied's indebtedness, is subject to the same infirmity. That application too was made with Jaffe's knowledge and consent and, indeed, pursuant to a specific agreement made between Jaffe and the Hutchinson Company attorney at the meeting. Plaintiff points to the dismissal of the mechanic's lien suit prior to the meeting as proof of the fact that Allied was not indebted to the Hutchinson Company and that the moneys in the hands of the mechanical subcontractor were now free of the Hutchinson Company's mechanic's lien, but, in agreeing that one-third of the IRS portion of the fund should go toward the reduction of the Hutchinson Company's tax liabilities, Jaffe undoubtedly considered the continued pendency of the mechanic's lien proceedings (by way of a forthcoming reargument and possible appeals),[10] as well as such factors as the effect of the New York Lien Law and the continuing dispute between the Hutchinson Company and Allied as to the status of the accounts between them.

It must be concluded, on the basis of the above considerations, that none of the contentions plaintiff makes for total or partial release of liability can be sustained.

■ Based on the record herein, it is plain that plaintiff has failed to carry his burden of overcoming the presumption of correctness attaching to the determination of the Commissioner of Internal Revenue that plaintiff was an officer of Allied responsible for collecting

---

10. The record herein does not indicate the basis of the dismissal of the suit.

and paying over to defendant the withholding and social security taxes owed to it by Allied, and that plaintiff willfully failed to perform such duty. Accordingly, plaintiff is not entitled to recover.

## CONCLUSION OF LAW

Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.