Marvin **GOLD**, Plaintiff,

v.

**UNITED STATES of America, Defendant.**

**No. 78 C 2570.**

United States District Court, E. D. New York.

Jan. 19, 1981.

In 1976, this section was recodified in substantially the same form as 18 U.S.C. § 4205(b).

474

Murray Appleman, New York City, for plaintiff Gold.

Michael J. Weitzner, U. S. Dept. of Justice, Tax Div., Washington, D. C., for defendant USA.

## MEMORANDUM OF DECISION AND ORDER

COSTANTINO, District Judge.

Plaintiff, Marvin Gold, ("Gold") seeks a refund of token payments made by him for his alleged violation of 26 United States Code § 6672.[1] The one hundred percent penalty assessment represents plaintiff's failure to account for and pay over taxes imposed upon the employees of Combined Property Services, Inc. ("Combined") for the third and fourth quarters of 1972. Gold paid part of the assessment made against him and then filed a timely claim for refund. The United States filed a counterclaim for the unpaid portion of the penalty assessment.

The gravamen of the dispute is whether plaintiff is liable for the penalty assessed against him pursuant to Section 6672 of the Internal Revenue Code. Specifically, the court must decide two discrete issues, to wit, (1) whether Gold is a person required to collect, account for and pay over income and Social Security taxes and (2) whether Gold wilfully failed to collect, account for and pay over such taxes.

The court conducted a nonjury trial to resolve these issues. After reviewing the transcripts and briefs submitted by counsel, the court finds that Gold was a responsible person within the meaning of the statute and that he wilfully failed to collect, truthfully account for and pay over the payroll taxes during the third and fourth quarters of 1972. Plaintiff therefore is liable for the penalties assessed against him pursuant to Section 6672.

*The Facts*

In 1965, plaintiff, Marvin Gold, joined A & S Management Corporation ("A & S"), a corporation which was engaged in the real estate management business of cooperative apartments. Gold, as Treasurer, and part owner of A & S, supervised the financial operations of the corporation. In that capacity, he handled the disbursements, the bills, the payroll taxes; he maintained the fiduciary and cooperative accounts; and controlled the financial information for both the management aspects of A & S and the individual cooperative apartments.

During the period prior to December, 1970, Gold prepared the taxes from the Brooklyn office and signed the payroll tax returns. All of the corporate records were maintained in the Brooklyn office and Gold regularly received financial reports and data. Gold had authority to incur expenses and to sign the corporation's checking account.

In May of 1969, Stephen Sarnoff ("Sarnoff") purchased an interest in A & S. Thereafter, Sarnoff, Gold and Quint each owned a one-third interest in A & S.[2] Gold, however, maintained control over the financial sector of the corporation. While Gold testified to the contrary, documentary evidence indicated that A & S experienced serious financial problems. Indeed, this court, after hearing the testimony in court and after examining the documentary proof, finds that much of Gold's testimony is contradictory and cannot be deemed credible.

As early as October of 1970, A & S had overdrafted its bank account. In short, the expenses of A & S consistently were paid by drawing on insufficient funds. Balance sheets prepared in mid-October of 1970 indicated that the company's net worth included a deficit of more than $300,000. Indeed, at one point during the course of the trial, Gold testified that he had been aware of a cash flow problem. In light of Gold's capacity within the A & S corporate hierarchy, this court finds that Gold was cogni-

---

1. This action deals only with Marvin Gold. Sarnoff, by his own admission, is liable for a violation of 26 United States Code § 6672. The Government has brought in Sarnoff as a third party defendant.

2. Stephen Sarnoff purchased an interest in A & S in 1969 through Mir-Sar Management Corporation. According to the record, Sarnoff owned the stock of Mir-Sar.

zant of the fact that financial problems beset the corporation.

In December of 1970, Alexander Wolf, together with those affiliated with A & S, formed Combined Property Services ("CPS"). In essence, A & S, with a few facial adjustments, became CPS. According to the formation agreement, Sarnoff became the titular head of CPS and was the Chief Executive Officer; Gold became the Secretary-Treasurer and was a member of the Executive Committee. Gold was in charge of bookkeeping, coordinated the activities of the cooperative buildings and prepared their budgets. However, his former pre-eminent power over the corporation's financial affairs was curtailed to a degree. Wolf became Chairman of the Board, and specifically acted for the corporation to solicit new business. Quint was placed in charge of the Florida cooperative operation.

According to this Agreement dated December 1, 1970 the Officers had power to sign the corporate checks. Further, both the Management Study conducted by Crest, McCormack and Paiget[3] and the salary scale granted to each officer, belie Gold's claim of ignorance and impotence in the affairs of the corporation. Testimony indicated that Gold ran the Brooklyn office, while Sarnoff operated from the East 52d Street Manhattan office. Indeed, as late as 1972, the Brooklyn office employed the largest number of people and most of the property owned by CPS was located in Brooklyn.

The exact location of the payroll records after the signing of the Agreement and Merger of December 1, 1970 ("Agreement"), however, was clouded by contradictory testimony. What is clear is that the Brooklyn office was not a lonely, forgotten outpost. Information of the financial condition of CPS could be garnered by Gold at the Brooklyn office and at the Executive meetings. Indeed, the Internal Revenue Service ("IRS") used both the Brooklyn address and the A & S name for a time period subsequent to the Merger Agreement. As late as August of 1972, IRS forwarded a notice regarding the untimely payment of taxes for the first quarter of 1972 to the Brooklyn address. Bank checks for CPS dated as late as August, 1973 were embossed with the Brooklyn address. Gold had the power, and invoked such power, to sign the corporate checks.

According to both Gold's deposition and the testimony of the bookkeeper at the Manhattan office, the payroll records for CPS were maintained by Automatic Data Processing Service ("ADP"). Beyond that fact, the bookkeeper had little knowledge of the connection between the Manhattan and Brooklyn offices. The record indicates that the payroll sheets and checks, for a time subsequent to the Agreement of 1970, were being forwarded to the Manhattan office from the Brooklyn office. Further, the Brooklyn office was in command of the time sheets for the Brooklyn employees. Yet, as early as the first quarter of 1972, CPS displayed extreme neglect in its prompt filing and payment of taxes. For the quarter ending December, 1971, the tax return was filed six months late; for the quarter ending March, 1972, the return was filed ten months late. The record belies a covert plan for delinquent payment of taxes. In point of fact, the IRS assessment of CPS indicates a consistent pattern of neglect at an early stage in the company's history.

It is evident from the record that a portion of the corporate expenses of CPS were incurred by Gold at the Brooklyn office. Throughout the time period in question, goods were delivered to the Brooklyn office

---

**3.** According to the record, Crest, McCormack & Paigat is an efficiency expert firm which did a study of and made recommendations for CPS. The study recommended that Gold operate as a non-resident home manager so that he could supervise the agents of the corporation. The organization chart prepared by Crest, McCormack & Paigat showed Gold as a member of the Executive Committee. This Committee was directly subordinate to the Chairman and Chief Executive officer, Stephen Sarnoff. Further, Gold was designated as the Secretary-Treasurer. In that capacity, he was to supervise the bookkeepers and clerical staff of the corporation.

and were examined by Gold. Upon Gold's approval of the order, the bills were forwarded to Manhattan for payment. According to both Gold and Wolf, the Executive Committee members were aware of the cash flow problems of CPS. Specifically, creditors contacted the Brooklyn office and complained because they had not been paid. Gold testified that he was aware of the corporation's financial problems and knew that Sarnoff had obtained unnecessary loans. Further, Gold admitted that he had acquiesced to the hiring of the accountant for CPS. Gold advised the court that by late 1972, he knew that CPS had failed to promptly file and pay its taxes. Yet, until the date of his departure, Gold continued to incur expenses for CPS, accepted his salary payments, voiced no objection to the payment of creditors or to the borrowing of large sums of money.

During the period 1971 to 1973, there were numerous meetings of the Board of Directors and Executive Committee. Gold testified that by late 1972, Sarnoff had reported to the Executive Committee that CPS had been delinquent in paying its taxes. Further, Gold was aware that an agreement with the IRS to refund the money owed had been reached. Gold, however, never suggested that the taxes forthwith be paid in full, although he believed that the corporation had the funds available to fully pay the accrued taxes. In essence, Gold completely relied on Sarnoff to furnish the periodic payments in accordance with the IRS schedule. By his own admission, however, Gold lacked faith in Sarnoff's ability to make the proper use of corporate funds. Most significantly, Gold testified that during his tenure at CPS he believed that it was Sarnoff who had failed to make proper and timely payments to the Government.

In 1973, the strategic importance of the Brooklyn office was placed in jeopardy by the opening of an office on Madison Avenue. Gold vehemently opposed a Manhattan office that would house all of the CPS employees. Finally, by an agreement dated June, 1973, Gold partially terminated his relationship with CPS. In light of Gold's expertise, however, an agreement was reached whereby he continued to assist with the bookkeeping operations and to perform executive services until September 30, 1973. In 1973, Gold received a salary from CPS comparable to that of the other officers. Significantly, during the year 1973, CPS paid one-half of a million dollars in wages. The record indicates, however, that none of the officers refused such payment or suggested that the company's tax debt be paid in one lump sum with the assets which were then available.

*Conclusions of Law*

■ A person responsible for collecting and paying taxes, who wilfully fails to do so, is subject to a civil penalty equivalent to one hundred percent of the taxes not collected or paid.[4] *Slodov v. United States*, 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1977). In the instant case, the plaintiff bears the burden of establishing, by a preponderance of the evidence, that he was not a responsible person who wilfully failed to collect and pay over the required payroll taxes for the third and fourth quarters of 1972. *Brown v. United States*, 591 F.2d 1136 (5th Cir. 1979); *Anderson v. United States*, 561 F.2d 162 (8th Cir. 1977); *United States v. Lease*, 346 F.2d 696 (2d Cir. 1965); *Werner v. United States*, 374 F.Supp. 558 (D.Conn.1974), *aff'd*, 512 F.2d 1381 (2d Cir. 1975); *Melillo v. United States*, 244 F.Supp. 323 (E.D.N.Y.1965).

■ A responsible person may include any person who is associated with the corporation such that he has significant, albeit not necessarily exclusive, authority to see

---

4. 26 U.S.C. § 6672(a) provides as follows:

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. No penalty shall be imposed under § 6653 for any offense to which this section is applicable.

what bills should or should not be paid.[5] *Kizzier v. United States*, 598 F.2d 1128 (8th Cir. 1978); *Turner v. United States*, 423 F.2d 448 (9th Cir. 1970); *Copperman v. United States*, 42 AFTR2d 78–5843 (E.D.N.Y.1978). *See Kalb v. United States*, 505 F.2d 506 (2d Cir. 1974), *cert. denied*, 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975); *Pacific National Insurance Co. v. United States*, 422 F.2d 26 (9th Cir. 1970), *cert. denied*, 398 U.S. 937, 90 S.Ct. 1838, 26 L.Ed.2d 269 (1970). The critical consideration is whether there exists a sufficient nexus between the plaintiff and the delinquent corporation's financial operation to warrant a finding that the plaintiff participated in decisions concerning the payment of creditors and the disbursal of funds and thus had authority to determine whether the United States or other creditors would be paid. *Monday v. United States*, 421 F.2d 1210 (7th Cir.), *cert. denied*, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970); *Silberberg v. United States*, 355 F.Supp. 1163 (S.D.N.Y. 1973). The Court finds that plaintiff has failed to carry his burden of proof with regard to the question of responsibility.

■ Here, the facts demonstrate that Gold participated in decisions concerning the payment of creditors and had authority to control corporate funds. Gold had the authority to sign or co-sign corporate checks. It is established that the ability to sign corporate checks is a significant factor because it generally comes with the ability to choose which creditors will be paid. *Burack v. United States*, 461 F.2d 1282, 198 Ct.Cl. 855 (1972). *See Hoeniger v. United States*, 76–1 U.S.T.C. ¶ 9296 (S.D.N.Y.1976); *Jacoby v. United States*, 37 AFTR2d 76–366 (S.D.N.Y.1975). Indeed, according to the terms of the December, 1970 Agreement, Gold wielded the power to co-sign checks and to participate in decisions regarding the operation and management of the corporation. Specifically, Gold testified that he tacitly approved the corporation's hiring decisions; he acquiesced to the corporation's obtaining unnecessary loans; he signed corporate checks; he incurred expenses for the Brooklyn branch of CPS; he dealt with creditors.

■ Gold was the Secretary-Treasurer, a director and shareholder of CPS. He managed the largest branch office of Combined. In these capacities, he exercised significant control over the management of the corporation. At one point, Gold exercised complete control over the books and records of the corporation and prepared the corporation's quarterly tax returns. In the latter stages of his employment with CPS, Gold continued to manage and to control the books for the Brooklyn cooperatives, prepared their budgets and supervised the field operations. Such factors militate against a finding that Gold's overall business relationship to CPS was tangential. Indeed, it strains credulity to believe the theory posited by Gold, to wit, that Sarnoff alone controlled the corporation and he did so, in part, by manipulating the inexperienced hands of Gold. As the record indicates, Gold was not a novice at managing the finances of a corporation. Further, the fact that Sarnoff was active in the corporation's financial affairs is not dispositive of plaintiff's liability since Section 6672 does not necessarily confine liability for unpaid taxes to one officer.[6] *Bolding v. United States*, 565 F.2d 663 (Ct.Cl.1977).

There is evidence before the court which shows that Gold had power over the disbursal of funds. Goods were purchased and paid with the approval of Gold. Most sig-

---

5. The meaning of "person" for the purposes of § 6672(a) is derived from 26 U.S.C. § 6671(b) which provides as follows:

> The term "person," as used in this subchapter, includes any officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member, is under a duty to perform the act in respect of which the violation occurs.

6. The fact that an officer may lack the sole duty to collect, account for and pay over the tax does not preclude a finding that he is a responsible person. *Kalb v. United States*, 505 F.2d 506 (2d Cir. 1974), *cert. denied*, 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975); *Brown v. United States*, 464 F.2d 590 (5th Cir.), *cert. denied*, 410 U.S. 908, 93 S.Ct. 962, 35 L.Ed.2d 270 (1972).

nificantly, the plaintiff himself testified that his office received, and he approved, bills for payment before such bills were forwarded to Manhattan. The record also indicates that creditors of CPS periodically dealt directly with Gold. In light of the foregoing, the Court concludes that Gold was a responsible person in accordance with the statutory definition.

 In addition to determining that plaintiff was required to pay taxes, it must also be concluded that he wilfully failed to do so. *McCarty v. United States,* 437 F.2d 961, 194 Ct.Cl. 42 (1971). Wilfulness in the context of this section means the voluntary, conscious, and intentional act to prefer other creditors of the corporation over the United States. *Mazo v. United States,* 591 F.2d 1151, 1152 (5th Cir. 1979), *cert. denied,* 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979); *Brown v. United States,* 591 F.2d 1136 (5th Cir. 1979); *Kalb v. United States, supra,* at 511; *Monday v. United States,* 421 F.2d 1210 (7th Cir.), *cert. denied,* 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970). More than mere negligence or accidental conduct is required for wilfulness; but wilful conduct may also include a reckless disregard for obvious or known risks. *Monday v. United States, supra,* at 1215. *See generally, Kalb v. United States, supra,* at 511; *Koegel v. United States,* 437 F.Supp. 176 (S.D.N.Y.1977).

The evidence presented to the Court strongly supports the conclusion that the plaintiff acted wilfully. The record indicates that Gold was touted as an important and knowledgeable corporate officer. Indeed, Gold was asked to remain with the corporation several months beyond his termination date in order to supervise the bookkeepers and to perform various executive services. He was acutely aware, during this entire period, that CPS and its predecessor corporation had serious cash flow problems. At one point, financial records and payroll information were housed solely in the Brooklyn branch of CPS. While the records were moved subsequent to the December, 1970 Agreement, there is strong evidence to support the argument that payroll records were maintained in Brooklyn as late as the middle of 1972. Further, the testimony indicates that the corporation's tax returns were delinquently filed as early as December 31, 1971.

There is evidence which also shows that the payroll checks, during the time period in question, were delivered by ADP to the Brooklyn office before being forwarded to Manhattan. In any event, the plaintiff was put on notice concerning the corporation's tax problems with the August 7, 1972 letter from the IRS. The plaintiff also was made aware of the mismanagement of the corporation by calls from unpaid and dissatisfied creditors. Yet Gold continued to give approval for the payment of creditors other than the United States. In spite of the blatant distress signals, Gold took no action to investigate whether the corporation's taxes were being paid and he made no attempt to correct the flagrant mismanagement. *See generally, Kalb v. United States,* 505 F.2d 506 (2d Cir. 1974), *cert. denied,* 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975); *Monday v. United States,* 421 F.2d 1210 (7th Cir.), *cert. denied,* 400 U.S. 821, 91 S.Ct. 38; 27 L.Ed.2d 48 (1970).

██ As a consequence of Gold's position in the corporate hierarchy, he was privy to information concerning the corporation, including the arrangement with the IRS to pay the delinquent taxes. Despite this knowledge, Gold never suggested that the arrearage promptly be paid in full.[7] Instead, he aggressively sought to have the corporation continue in business while it paid the arrearages in installments to the IRS. Indeed, during the period in question, Gold continued to incur expenses for the corporation, he approved of the payment of

---

7. The existence of the IRS schedule does not necessarily absolve the plaintiff of liability under Section 6672. *Teel v. United States,* 529 F.2d 903 (9th Cir. 1976); *Monday v. United States,* 421 F.2d 1210 (7th Cir.), *cert. denied,* 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970). As indicated in the text, this theory of absolution perforce must be defeated by the unjustifiable reliance on Sarnoff's representations and promises.

creditors besides the United States and he approved of salary benefits for all officers notwithstanding the fact that the United States had not been paid.

■ Gold advances the argument that his conduct was justified since Sarnoff had represented that he would comply with the IRS schedule. Such reliance, however, was misplaced and, in light of the record, constituted recklessness. Specifically, Gold testified that he was aware of the fact that Sarnoff had obtained unnecessary corporate loans. By his own admission, Gold lacked faith in Sarnoff's ability to make the proper use of corporate funds. Most significantly, Gold testified that during his tenure with CPS, he believed that it was Sarnoff who had failed to make proper and timely payments to the IRS. Thus, Gold had both actual knowledge and an intuition that the corporation was being mismanaged and yet did nothing to remedy the situation. According to Section 6672, such a failure by a responsible person to investigate or to correct mismanagement, after having been put on notice that withholding tax problems exist, constitutes wilful conduct. *Kalb v. United States,* 505 F.2d 506 (2d Cir. 1974), *cert. denied,* 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975); *Copperman v. United States,* 42 AFTR2d 78–5843 (E.D.N.Y.1978).

In light of the foregoing, the Court finds that the plaintiff has failed to establish by a preponderance of the evidence that he was not a responsible person and that he did not act wilfully in failing to pay the required payroll taxes. Accordingly, it is the determination of this Court that the plaintiff take nothing on his complaint against the United States of America, and that the plaintiff pay to the United States of America on its counterclaim against the plaintiff.

So Ordered.