**In re William Lawrence SUMMERS and Jacquelyn Maley Summers, Debtors.**

**Bankruptcy No. B80–01121.**

United States Bankruptcy Court, N.D. Ohio, E.D.

Sept. 8, 1983.

Lewis Einbund, Sindell, Sindell & Rubenstein, Cleveland, Ohio, for Debtors.

Matthew Yackshaw, U.S. Dept. of Justice, and J. William Petro, U.S. Atty., Washington, D.C., for U.S., I.R.S.

## MEMORANDUM OF OPINION

JOHN F. RAY, Jr., Bankruptcy Judge.

This matter is before the Court on the objection of debtor, William Lawrence Summers, to the claim of the United States of America, Internal Revenue Service, the evidence and briefs of counsel.

The issue for decision by the Court is whether the debtor is liable to the United States of America for a 100 percent penalty in the amount of $28,741.96. The United States asserts this claim against the debtor pursuant to Section 6672 of the Internal Revenue Code of 1954 (26 U.S.C. § 6672),[1] because the debtor was a person required to, but who willfully failed to collect, truthfully account for and pay over all of the federal income and social security taxes withheld from wages of the employees of M.M.P., Inc. for the periods ending September-

ber 30, 1979, December 31, 1979 and March 31, 1980.

### Questions Presented

1. Was the debtor a person required to collect, truthfully account for and pay over the federal income and social security taxes withheld from wages of the employees of M.M.P., Inc. for the periods in question?

2. If the Court finds the debtor was such a person, was his failure to collect, truthfully account for and pay over such taxes willful?

### Findings of Fact

1. M.M.P., Inc. was incorporated in early 1978 to purchase assets of a plastic extrusion business. William L. Summers and Gerald P. Kretschmar each purchased 218 shares of the common stock of M.M.P., Inc. The remaining 64 shares were purchased by an investor group known as the "Hecht Group". (June 15, 1983 Tr. 153–54)

2. William L. Summers, Gerald P. Kretschmar and Cray J. Coppins, Jr. were elected directors of M.M.P., Inc. Summers was chairman of the board of directors and secretary, and Kretschmar was president. (June 15, 1983 Tr. 123–24)

3. At Summers' insistence, Rose Marie Benshoff was hired as bookkeeper. (June 15, 1983 Tr. 126) She was also elected treasurer of the corporation. (May 27, 1983 Tr. 6)

4. Summers was present at the negotiations for the purchase of the assets of Midwest Molecular Products, Inc., and signed the sales agreement on behalf of M.M.P., Inc. (Government Ex. Z)

5. Sheldon Epstein, Summers' accountant, arranged financing for M.M.P., Inc. from various sources. (June 15, 1983 Tr.

1. § 6672. *Failure to collect and pay over tax, or attempt to evade or defeat tax.*

(a) *General rule.*—Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the

payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. No penalty shall be imposed under section 6653 for any offense to which this section is applicable.

116) The major source of funding came from Walter Heller & Co., which loaned money to M.M.P., Inc., taking a security interest in most, if not all, of its assets. (June 15, 1983 Tr. 116–17) Summers signed the loan documents on behalf of M.M.P., Inc., and personally guaranteed the loan. (June 15, 1983 Tr. 127–28)

6. Summers negotiated a lease for plant facilities for M.M.P., Inc. with Norton Vinney. (June 15, 1983 Tr. 120)

7. Summers invested over $130,000 in M.M.P., Inc., in addition to personally guaranteeing loans from various sources, including Walter Heller & Co. (June 15, 1983 Tr. 183–84)

8. Kretschmar directed the day-to-day operations of M.M.P., Inc. from July to September, 1978. In September, 1978, after a physical altercation between Summers and Kretschmar, Kretschmar was removed as president of M.M.P., Inc., and replaced by John Jesensky. Summers voted to remove Kretschmar as president. (June 15, 1983 Tr. 132–34)

9. Prior to his installation as president, Jesensky had been vice-president of sales for M.M.P., Inc. When Summers approached him with the offer of the presidency, Jesensky balked, since he had no background in finance. Summers assured him that Benshoff and Summers had sufficient background to manage that aspect of the business. (June 16, 1983 Tr. 312–13)

10. Jesensky was president of M.M.P., Inc. until September, 1979. During his tenure, he met with Summers on the premises of M.M.P., Inc. on a daily basis. The two discussed sales, supplies and cash flow problems of M.M.P., Inc. (June 16, 1983 Tr. 313–17)

11. During the time Jesensky was president, Summers was also informed by Benshoff of the availability of funds for each week from Walter Heller & Co. (June 15, 1983 Tr. 174)

12. On or about June 20, 1979, the Internal Revenue Service filed a lien against M.M.P., Inc. for failure to remit withholding and social security taxes. (June 16, 1983 Tr. 300) A copy of this lien was served on William L. Summers at his law office. (June 15, 1983 Tr. 131)

13. As a result of the federal tax lien, Walter Heller & Co. stopped advancing funds to M.M.P., Inc. To have funding restored, Summers flew to Chicago, along with his accountant, Sheldon Epstein, and other officers of M.M.P., Inc. As a result of meeting with Walter Heller & Co., the lien was paid and funding was reinstated. (June 15, 1983 Tr. 132)

14. M.M.P., Inc. prepared monthly profit and loss statements and balance sheets for Walter Heller & Co. Copies of these financial reports were distributed to M.M.P., Inc. officers, including Summers. (June 15, 1983 Tr. 18–19)

15. After the federal tax lien was cancelled of record, Summers never asked Benshoff or any other officer to report to him regarding payment of taxes. Summers testified that he never again made any inquiry regarding payment of taxes. (June 15, 1983 Tr. 206–07)

16. In midsummer, 1979, in an effort to revive M.M.P., Inc., Summers contacted Robert Fox. Robert Fox had extensive experience in plastic processing and marketing, but no educational or employment background in the area of finance. (May 27, 1983 Tr. 10) Fox never indicated to Summers that he had any financial expertise, and, in fact, Fox did not inspect the books of M.M.P., Inc. when he visited the plant in August, 1979. (May 27, 1983 Tr. 17–22)

17. On September 4, 1979, Fox was hired to take charge of M.M.P., Inc., though his exact title is disputed. Summers testified Fox had plenary authority to run M.M.P., Inc. and manage both its finances and its production and marketing facilities. Summers claimed that Fox became chairman of the board of M.M.P., Inc., though Summers remained as secretary; he also noted that Fox's employment agreement contained no language limiting his control over finances. (June 15, 1983 Tr. 139) Fox testified that the original employment con-

tract provided that all financial decisions would be made by Summers; that this provision was deleted in order to give Fox some flexibility to make purchases in the ordinary course of business. (May 27, 1983 Tr. 26) Summers never introduced any board resolution or any evidence other than his own testimony that Fox became chairman of the board.

18. After Fox was hired and until final liquidation of M.M.P., Inc., the company continued to experience financial difficulties. These difficulties were common knowledge among the employees, who were aware that M.M.P., Inc. was having trouble paying its creditors in the ordinary course of business. (June 16, 1983 Tr. 241, 284 and 322) From October, 1979, through January, 1980, payments were made to suppliers and other creditors of M.M.P., Inc. (Government Exs. D and E) Personal loans made by Summers to M.M.P., Inc. were repaid during this period, and M.M.P., Inc. paid weekly salaries to Summers as well as personal expenses, such as for Summers' car and his golf club dues. (June 15, 1983 Tr. 94–96) During this same period, the monthly financial reports continued to show accrued payroll taxes which had not been paid and were carried as current liabilities of M.M.P., Inc. (Government Exs. A–C; June 15, 1983 Tr. 45–49)

19. Summers asserted at trial and in his brief that he had relinquished all control of M.M.P., Inc. during the period in question. He testified that his legal practice and the illness and eventual death of his father occupied his time so completely that he was not involved in management of M.M.P., Inc. during the corporation's last months of operation. (June 15, 1983 Tr. 143–47) He also maintained he had no knowledge that taxes had not been paid until well after M.M.P., Inc. ceased doing business. (June 15, 1983 Tr. 146) To assess the substance of this position, it is necessary to examine the testimony in some detail.

20. Rose Marie Benshoff repeatedly asserted that she never discussed the finances of M.M.P., Inc. with Summers. (June 15, 1983 Tr. 17, 34, 41, 53, 73, 93) This asser-

tion was contradicted by Patricia Christopher, a secretary at M.M.P., Inc., who testified Summers and Benshoff met at least once a week in Summers' office, and that Benshoff would bring stacks of bills into these meetings. (June 16, 1983 Tr. 237) Barbara E. Van Domelen, another M.M.P., Inc. office employee, testified that Benshoff sometimes stated she had to review bills with Summers. (June 16, 1983 Tr. 272) John Jesensky also testified that he saw Benshoff meet with Summers, and that Benshoff was carrying papers when they met. (June 16, 1983 Tr. 318) Though Jesensky could not identify those papers as invoices, it is a reasonable inference that Benshoff, as M.M.P., Inc.'s bookkeeper and treasurer, would have been carrying financial documents of one sort or another. Benshoff's assertion is further called into question by the very nature of her employment at M.M.P., Inc. and her relationship to Summers. Benshoff testified she was employed by M.M.P., Inc. as a result of her prior experience as a bookkeeper and accountant for Summers' firm, her close friendship with Summers and his personal trust in her. (June 15, 1983 Tr. 7, 10, 13) She acknowledged she was the most knowledgeable person at M.M.P., Inc. regarding the corporation's finances. (June 16, 1983 Tr. 16). She stated she met regularly with Robert Fox and previously with John Jesensky to discuss M.M.P., Inc.'s finances. (May 27, 1983 Tr. 9–15) Yet when asked if she discussed finances with Summers, she stated, "I wouldn't be qualified to report to him about the company's goings on." (June 15, 1983 Tr. 16) The extent of Summers' financial stake in M.M.P., Inc. also makes it unlikely that he was unaware of the unpaid taxes. Summers testified that during Jesensky's tenure as president the two men regularly discussed the problems at M.M.P., Inc., not because of Summers' expertise in plastics, but because Jesensky knew the extent of Summers' financial involvement and the risk of potential loss to Summers. (June 15, 1983 Tr. 170) Benshoff, as M.M.P., Inc. treasurer, was also aware of Summers' financial stake in M.M.P., Inc. Furthermore, as a result of her meetings with Internal

Revenue Service Agent Henry Stachowicz, she was aware of the consequences of non-payment of taxes. (June 16, 1983 Tr. 296–97) She testified Summers called a meeting after the cutoff of funds from Walter Heller & Co., and instructed "everyone" to pay the taxes. (June 15, 1983 Tr. 80–81) Summers testified he told M.M.P., Inc.'s employees that his license to practice law might be at stake if taxes were not paid. (June 15, 1983 Tr. 130, 147) Yet Benshoff maintained she never told Summers about the lapse in payments, even though she "couldn't get through to" Fox that taxes had to be paid (May 27, 1983 Tr. 21), and even though she knew that if taxes were not paid, Summers might face a heavy fine and possible loss of his license to practice law.

21. Besides meetings with Benshoff, Summers was notified of the unpaid taxes through the monthly reports prepared by M.M.P., Inc. for Walter Heller & Co., reflecting the tax liability. Benshoff admitted that copies of these reports were routed to Summers and placed in his mailbox. She testified, however, that Summers did not receive the reports, since he never visited the premises of M.M.P., Inc. after Fox was hired. (June 15, 1983 Tr. 36, 52) Benshoff's testimony on Summers' absence from M.M.P., Inc. after September, 1979 was contradicted by five witnesses. (June 16, 1983 Tr. 243, 274, 285–86, 327; May 27, 1983 Tr. 51)

22. Summers was also made aware of the company's finances as part of his efforts to find additional funding for the business. Fox and Jesensky both testified that Summers told them he was attempting to find additional financing for M.M.P., Inc. (May 27, 1983 Tr. 39; June 16, 1983 Tr. 317) Benshoff also knew that Summers was attempting to find new funding for M.M.P., Inc., but she testified Summers never gave financial information to investors or potential investors. (June 15, 1983 Tr. 101–04) Fox, however, testified that Summers requested Fox to ask Benshoff to prepare a list of M.M.P., Inc.'s debts as of January 10, 1980, to give to potential investors. (May 27, 1983 Tr. 39) Such a list must have included the tax liability.

23. Summers also maintained at trial that he did not take part in the management of M.M.P., Inc. after Fox was hired. (June 15, 1983 Tr. 143–47) Benshoff testified that Summers never gave her orders to pay creditors. (June 15, 1983 Tr. 32) This contention is not only contradicted by testimony of other M.M.P., Inc. employees, but by Summers' own testimony that he "arranged" with Benshoff to pay the landlord. (June 15, 1983 Tr. 181)

24. Benshoff's testimony was contradicted by every employee of M.M.P., Inc. who testified regarding payment of creditors. Fox testified he always consulted Summers before making payment arrangements with any creditors of M.M.P., Inc. (May 27, 1983 Tr. 67–68) Patricia Christopher testified that Summers and Benshoff would meet in Summers' office, and that afterwards Benshoff would issue orders regarding payment of creditors. (June 16, 1983 Tr. 248) Barbara Van Domelen stated Benshoff indicated on more than one occasion that she would have to review payments to creditors with Summers. Finally, Jesensky testified that during his tenure as president he would instruct Benshoff to pay certain creditors, and later found that other creditors had been paid instead. (June 16, 1983 Tr. 321) Since Benshoff did not pay any bills without approval (May 27, 1983 Tr. 7), and since Summers was the only person other than Jesensky who could approve such payments during Jesensky's presidency (May 27, 1983 Tr. 8), the authorization for payments must have come from Summers.

25. This Court, therefore, finds that William L. Summers was a person responsible for collection and payment of withholding and social security taxes throughout the existence of M.M.P., Inc. The Court also finds that Summers knew withholding and social security taxes had not been paid during the last quarter of 1979 and the first quarter of 1980, and either decided to pay other creditors in preference to the Internal Revenue Service, or failed to take the nec-

essary steps to insure that the taxes were in fact paid.

## Conclusions of Law

■ 1. To be liable for the 100 percent penalty prescribed by Internal Revenue Code Section 6672 for the amount of unpaid withholding and social security taxes, Summers must be found to be a person who was responsible for collecting and paying taxes and willfully failed to pay such taxes. *Slodov v. United States,* 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978); *Braden v. United States,* 318 F.Supp. 1189 (S.D.Ohio 1970), *aff'd* 442 F.2d 342 (6th Cir.1971), *cert. denied,* 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (1971).

■ 2. Summers, as the person seeking to avoid the penalty, bears the burden of proving by a preponderance of the evidence that he was not a "responsible person", or that his failure to pay the taxes was not "willful". *United States v. Pomponio,* 635 F.2d 293 (4th Cir.1980); *Brown v. United States,* 591 F.2d 1136 (5th Cir.1979); *Anderson v. United States,* 561 F.2d 162 (8th Cir.1977).

■ 3. A "responsible person" may include any person with significant, though not exclusive, authority to decide what bills are to be paid. An officer of a corporation may be found to be a responsible person, even if others in the corporation also have the duty to collect and pay over taxes. *Kalb v. United States,* 505 F.2d 506 (2d Cir.1974), *cert. denied,* 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975).

■ 4. As an officer, director and major shareholder of M.M.P., Inc., Summers was a "responsible person" within the meaning of Section 6672 of the Internal Revenue Code. Summers was a "high corporate official charged with general control over corporate business affairs, who participated in decisions concerning payment of creditors and disbursal of funds." *Monday v. United States,* 421 F.2d 1210, 1215 (7th Cir.1970); *Braden v. United States, supra.* As such, he was under a duty to collect and pay over the withholding and social security taxes.

Summers' attempt to show that Fox had authority to order payment of taxes merely demonstrates that Summers was not solely responsible; this does not relieve Summers of responsibility.

5. Another prerequisite to liability under Section 6672 of the Internal Revenue Code is a finding that the responsible person willfully failed to pay the required taxes. Willful conduct has been defined as "intentional, knowing and voluntary acts. It may also indicate a reckless disregard for obvious or known risks." *Monday v. United States, supra,* at 1215.

■ 6. Willfulness is shown by a decision to pay other creditors when taxes are known to be unpaid. *Mazo v. United States,* 591 F.2d 1151 (5th Cir.1979), *cert. denied,* 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979); *Brown v. United States, supra; Kalb v. United States, supra.* It is clear from the evidence adduced at the trial of this case that Summers knew of unpaid taxes through the monthly statements sent to Walter Heller & Co., copies of which he was furnished, and through meeting with Rose Benshoff. Even with this knowledge, Summers permitted the payment of rent, suppliers, payroll and his own loans and personal expenses, such as automobile and club dues, in preference to the United States government.

■ 7. Even if Summers had not known of the unpaid taxes, his conduct falls within the "reckless disregard" standard of *Monday, supra.* Liability has been imposed where a taxpayer knows of problems in paying taxes and in corporate management, and fails to investigate to insure payment of taxes or take steps to correct mismanagement. *Gold v. United States,* 506 F.Supp. 473 (D.D.C.1981). Summers knew that M.M.P., Inc. was having trouble with payments in the ordinary course of business; his efforts to raise new capital were a direct result of his knowledge of those problems. Yet he and Rose Benshoff testified that despite his concern over possible loss of his license to practice law and M.M.P., Inc. problems in the past with paying withhold-

ing and social security taxes, he took no steps whatsoever to correct mismanagement of funds or insure that taxes were paid on a timely basis. Instead, Summers maintained, he left direction of M.M.P., Inc. completely in Fox's hands.

If, after receiving actual notice [of liability for taxes], corporate officials could once again delegate their responsibility to subordinates, then repeated escape from liability would be possible and the government would be required to monitor corporate affairs daily. The statutory concept of willfulness conveys no such meaning.

*Mazo v. United States, supra,* at 1157.

8. The Court finds Summers has failed to establish by a preponderance of the evidence that he was not a responsible person, and that he did not act willfully in failing to pay the withholding and social security taxes.

Based upon the foregoing findings of fact and conclusions of law, the Court finds William Lawrence Summers was a responsible person with power and responsibility within M.M.P., Inc. of seeing that the withholding and social security taxes were paid to the United States of America, Internal Revenue Service, who willfully failed to pay such taxes for the quarters ending September 30, 1979, December 31, 1979 and March 31, 1980.

Therefore, the objection of debtor, William Lawrence Summers, to the claim of the United States of America, Internal Revenue Service, should be overruled.