**Louis A. FARRIS, Jr.**

v.

**The UNITED STATES.**

No. 361–81T.

United States Claims Court.

March 1, 1984.

Larry K. Hercules, Dallas, Tex., for plaintiff. Edward G. Lavery, Dallas, Tex., of counsel.

Michael V. Marino, Washington, D.C., with whom were Asst. Atty. Gen. Glenn L. Archer, Jr., and Theodore D. Peyser, Jr., Washington, D.C., for defendant.

## OPINION

WHITE, Senior Judge.

The question to be decided by the court in this case is whether the Internal Revenue Service acted properly in assessing against the plaintiff, Louis A. Farris, Jr., a resident of Dallas, Texas, 100 percent penalties in connection with the failure of a California

corporation, Harbor Boat Building Company ("Harbor Boat"), to pay federal employment taxes that were due for the third and fourth calendar quarters of 1975 and the first calendar quarter of 1976.

The assessments for the three quarters were in the respective amounts of $259,396.06, $122,872.02, and $63,003.27. The plaintiff paid a small portion of each assessment against him, and he is suing for a refund.

The United States has filed a counterclaim for the portion of each assessment that remains unpaid.

It appears that the Internal Revenue Service did not err in making the assessments against the plaintiff. Accordingly, the plaintiff is not entitled to recover on his claim for a refund, and the defendant is entitled to recover on its counterclaim.

### The Statutory Test

The assessments against the plaintiff were made under section 6672 of the Internal Revenue Code of 1954 (26 U.S.C. § 6672 (1976)), which at the time provided in part as follows:

> (a) General rule.—Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to * * * truthfully account for and pay over such tax * * * shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax * * * not accounted for and paid over. * * *[1]

According to the plain language of the pertinent statutory provision, the propriety of the assessments made against the plaintiff depends upon a determination as to whether the plaintiff was a "person required to * * * truthfully account for, and pay over" the federal employment taxes that were due from Harbor Boat for the three quarters in question,[2] and, if so, whether the plaintiff "willfully" failed to discharge this obligation. In other words, the assessments against the plaintiff were proper if—and only if—first, the plaintiff was a person responsible for seeing to it that the federal employment taxes which Harbor Boat withheld from the wages of its employees were accounted for and paid over to the Internal Revenue Service, and, second, the plaintiff willfully failed to do so. The presence or absence of these factors depends upon the facts of the case. *Burack v. United States,* 198 Ct.Cl. 855, 868, 461 F.2d 1282, 1291 (1972); *Godfrey v. United States,* 3 Cl.Ct. 595, 604 (1983).

As both elements, responsibility and willfulness, were essential to the making of proper assessments against the plaintiff under 26 U.S.C. § 6672(a), the plaintiff can recover in the present case by proving either that he was not a responsible person, or that he did not willfully fail to account for and pay over the federal employment taxes which Harbor Boat withheld from the wages of its employees. *See McCarty v. United States,* 194 Ct.Cl. 42, 53–54, 437 F.2d 961, 967 (1971).

### Responsibility

Any corporate officer or employee is a responsible person for the purposes of 26 U.S.C. § 6672 if he (or she) has the power and authority to avoid a default in the payment of the tax (*White v. United States,* 178 Ct.Cl. 765, 771, 372 F.2d 513, 516 (1967)), or the power to direct the payment of the tax (*Feist v. United States,* 221 Ct.Cl. 531, 539, 607 F.2d 954, 960 (1979); *Godfrey v. United States, supra,* 3 Cl.Ct. at 603), or the power to prevent disbursement of funds except to appropriate creditors (*Burack v. United States, supra,* 198 Ct.Cl. at 869, 461 F.2d at 1291), or the ultimate authority over the expenditure of funds (*White v. United States, supra,* 178 Ct.Cl. at 772, 372 F.2d at 516), or the authority to control the corporation's financial decisions (*Feist v. United*

---

1. The same language now appears in 26 U.S.C. § 6672(a) (1982).

2. Harbor Boat collected the employment taxes from its employees under 26 U.S.C. §§ 3102(a) and 3402(a), but failed to "account for, and pay over" such taxes to the Internal Revenue Service.

States, supra, 221 Ct.Cl. at 540, 607 F.2d at 960), or the final word as to what bills or creditors should be paid, and when (*White v. United States, supra,* 178 Ct.Cl. at 771, 372 F.2d at 517).

Any high-ranking corporate official, such as a vice-president, is considered to be a responsible person, in the absence of evidence to the contrary. *Bolding v. United States,* 215 Ct.Cl. 148, 159, 565 F.2d 663, 670 (1977).

■ Responsibility cannot be avoided by showing that someone else performed the function of actually disbursing the corporation's funds, or that a sizable staff obscured the failure to pay the tax money over to the United States, or that the official or employee in question was too busy to oversee other personnel in determining what creditors should be paid, and when. *Feist v. United States, supra,* 221 Ct.Cl. at 539–40, 607 F.2d at 960. A corporate official or employee is still considered to be responsible so long as he could have seen to it that the taxes were paid. *White v. United States, supra,* 178 Ct.Cl. at 772, 372 F.2d at 517.

■ The evidence in the record clearly shows that, under the various criteria previously mentioned, the plaintiff was a responsible person with regard to accounting for and paying over federal employment taxes due from Harbor Boat. In the first place, Harbor Boat was a wholly owned subsidiary of Chancellor Corporation ("Chancellor"), a Texas corporation with its principal office located in Dallas, Texas. The plaintiff was the head, and, with his wife, Barbara Farris, the owner, of Chancellor. By virtue of the authority which the plaintiff exercised over Chancellor, he also had the authority to supervise and control the financial and other affairs of Chancellor's wholly owned subsidiaries, including Harbor Boat. The circumstance that, as a matter of policy, the plaintiff preferred not to become involved in the operations of the subsidiary corporations, and, under ordinary circumstances, accorded the subsidiary corporations "operating autonomy with accountability," is ir-

relevant. It was the *authority* to control that was significant.

In addition to the power of control which the plaintiff could have exercised over Harbor Boat's finances by virtue of his ownership and control of the parent corporation, Chancellor, the plaintiff elected to become the chairman of the board and a vice-president of Harbor Boat. Also, for the periods involved in the present case, the plaintiff had conferred upon himself the authority to sign checks on Harbor Boat's bank accounts.

By virtue of the factors previously mentioned, the plaintiff had the *authority* to see to it that Harbor Boat accounted for and paid over the federal employment taxes which Harbor Boat withheld from the wages of its employees. Accordingly, it is clear that the plaintiff was a responsible person for the purposes of 26 U.S.C. § 6672(a).

■ The circumstance that, for at least part of the third quarter of 1975, there was another responsible person connected with Harbor Boat, in the person of Hugh Murray, who was also a vice-president of Harbor Boat with check-signing authority, does not relieve the plaintiff of his responsibility for the payment of the federal employment taxes for the third quarter of 1975. A corporation can have two or more responsible persons at the same time. *White v. United States, supra,* 178 Ct.Cl. at 771, 372 F.2d at 516.

*Willfulness*

■ It has been said that the term "willfully," as used in 26 U.S.C. § 6672(a), means a deliberate choice—voluntarily, consciously, and intentionally made—to pay other creditors instead of paying the Government the taxes due; and that neither an intent to defraud or deprive the Government of the taxes due, nor the presence of bad motives or wicked design, is an essential element of willfulness for this purpose. *White v. United States, supra,* 178 Ct.Cl. at 778–79, 372 F.2d at 521; *Marlowe v. United States,* 2 Cl.Ct. 711, 715 (1983).

Also, if a responsible person recklessly disregards his duty to account for and pay over federal employment taxes withheld from employees, or ignores an obvious and known risk that such funds might not be remitted, this constitutes willfulness for the purpose of 26 U.S.C. § 6672(a). *Feist v. United States, supra,* 221 Ct.Cl. at 542, 607 F.2d at 961.

Whether the plaintiff willfully failed to see to it that Harbor Boat paid over to the Internal Revenue Service the federal employment taxes which Harbor Boat withheld from the wages of its employees for the three calendar quarters involved in the litigation is a question of fact. *Burack v. United States, supra,* 198 Ct.Cl. at 868, 461 F.2d at 1291; *Godfrey v. United States, supra,* 3 Cl.Ct. at 604. Consequently, it is necessary to review the pertinent facts in considerable detail.

█ In making the review, it must be remembered that the plaintiff has the burden of proof on the issue of willfulness— *i.e.,* he has the burden of proving the lack of willfulness on his part. He can meet this burden by showing that he did not disregard his duties, and that he undertook all reasonable efforts to see to it that the taxes would be paid. *Feist v. United States, supra,* 221 Ct.Cl. at 542, 607 F.2d at 961.

█ So far as the record shows, Harbor Boat's initial delinquency with respect to the payment of federal employment taxes occurred in connection with such taxes for the second calendar quarter of 1975. The liability for that quarter amounted to $567,-464.01, and only $139,592.51 was timely deposited in a government depositary, as required by law.

At the time, Harbor Boat was experiencing a cash flow problem. Harbor Boat was a relatively small company, with its principal place of business on Terminal Island at San Pedro, south of Los Angeles. The main business of Harbor Boat was ship construction and repair for the maritime industry, including the United States Navy. The total sales of Harbor Boat in 1972 amounted to $2,500,000, and the total sales in 1973

ranged somewhere between $5,000,000 and $6,000,000.

In 1974, Harbor Boat over-extended its resources by entering into two contracts with the Navy, one for the performance of repair work on the U.S.S. *Point Loma* for $3,723,269 and the other for topside repairs on the U.S.S. *Hollister* for $1,749,702. Then, the Navy complicated the situation by issuing an extraordinary number of contract changes, which increased the contract price on the *Point Loma* job to $6,775,244, or an increase of 82 percent, and the contract price on the *Hollister* job to $2,788,-719, an increase of 59 percent. Harbor Boat's cash flow problem during the second calendar quarter of 1975 was caused principally by the expansion of the *Point Loma* and *Hollister* jobs.

As of the end of June 1975, Harbor Boat was not only delinquent to the extent of $427,871.50 with respect to its federal employment tax liability, but it was also having problems with business creditors.

Just when the plaintiff personally became aware of Harbor Boat's delinquency with respect to the federal employment taxes is not clearly established by the evidence in the record, but it is certain that the plaintiff learned of this particular problem not later than August 2, 1975.

Under pertinent contract provisions, the Navy retained 10 percent of the money otherwise due to Harbor Boat on the *Point Loma* and *Hollister* jobs. The amounts thus retained were finally to be paid to Harbor Boat when each job was completed. On June 20, 1975, however, Harbor Boat began seeking the release of some of the retained money to permit the payment of taxes due, principally the federal employment taxes for the second quarter of 1975, and otherwise to help alleviate the company's cash flow problem.

Harbor Boat was contemporaneously seeking bank financing to assist it with its cash flow, and appeared to have found a bank, Union Bank of California, willing to provide the financing. The plaintiff had initiated negotiations with Union Bank and had obtained the bank's oral agreement to

provide a $1,000,000 line of credit to Harbor Boat. The line of credit was to be secured by Harbor Boat's accounts receivable and also by $500,000 in cash, which would probably come from the Navy and would be placed in a certificate of deposit with Union Bank. Hugh Murray, the resident vice-president at Harbor Boat and the only official regularly stationed there with check-signing authority, was aware of this arrangement.

The Navy notified Harbor Boat that it was prepared to release a 5 percent retainage (amounting to approximately $600,000) to Harbor Boat on August 2, 1975. On that date, Hugh Murray travelled to San Diego in order to pick up the Navy check. He took with him two Harbor Boat checks, one payable to the Internal Revenue Service in the amount of $427,871.50, to pay the delinquent federal employment taxes for the second quarter of 1975, and the other payable to the State of California in the amount of $99,210.78, covering payroll taxes due that State.

On August 2, 1975, in a telephone conversation between the plaintiff and Edward Lovelock, who had been placed at Harbor Boat by the plaintiff in July 1975, the plaintiff was informed that Hugh Murray had gone to San Diego for the Navy retainage check and intended to use most of the money for the payment of delinquent taxes. The plaintiff became upset and stated that he did not want Hugh Murray to use the Navy money for the payment of taxes, as he (the plaintiff) intended for the money to be deposited in Union Bank for the purpose of obtaining a line of credit from the bank. Edward Lovelock got in touch with Hugh Murray in San Diego over the telephone, and told him of the plaintiff's wishes with respect to the Navy money. Nevertheless, Hugh Murray elected to pay the delinquent taxes rather than carry out the plaintiff's wishes; and, after receiving the retainage check from the Navy, Hugh Murray deposited the check in a Harbor Boat checking account and immediately mailed to the Internal Revenue Service and to the State of California the checks that had been prepared for them.

When the plaintiff saw Hugh Murray after the August 2, 1975, incident, he reprimanded Hugh Murray for "breaching trust" by using the money from the Navy to pay delinquent taxes instead of depositing the money in Union Bank.

After the incident of Hugh Murray's failure to carry out the plaintiff's wishes with respect to the use of the retainage money from the Navy, the plaintiff and other personnel from Chancellor, the parent corporation, became actively involved in supervising the financial affairs of Harbor Boat; and this continued as long as Harbor Boat remained in business. Although the plaintiff himself did not remain continuously at Harbor Boat, he was there with some frequency. When present, the plaintiff devoted his time principally to the financial affairs of Harbor Boat. While the plaintiff was absent from Harbor Boat, he was represented there at practically all times by at least one official from Chancellor.

Although Hugh Murray continued in the service of Harbor Boat until sometime in October of 1975, his work for the company after the retainage check incident was devoted principally to the development of claims against the Navy. On August 13, 1975, the plaintiff relieved Hugh Murray of his previous authority and responsibility with respect to financial matters, including the payment of federal employment taxes. After August 13, 1975, it was the plaintiff who manually signed checks for Harbor Boat, although the facsimile of Hugh Murray's signature continued to be used for a time after August 13 on payroll checks to Harbor Boat's employees.

During the period of 2 or 3 weeks immediately following the August 2, 1975, incident relative to the disposition of the Navy retainage check, a review of Harbor Boat's financial records was made by Chancellor personnel. At that time, Harbor Boat was delinquent with respect to federal employment taxes for the third calendar quarter of 1975. For the payrolls of the third quarter, up to and including the August 10 payroll, Harbor Boat had withheld federal

employment taxes in the total amount of $272,047.14 from the wages of its employees. All of this tax money had been retained by Harbor Boat and used for its own purposes, and none of it had been deposited in a government depositary.

After the completion of the review previously mentioned, the plaintiff was informed of the delinquency with respect to the federal employment taxes for the third quarter of 1975. However, none of the $272,047.14 was ever paid over to the Internal Revenue Service.

With respect to Harbor Boat's five payrolls next following the August 10, 1975, payroll and extending through the September 14 payroll, all funds which Harbor Boat withheld from the wages of its employees for federal employment taxes were properly deposited and later paid over to the Internal Revenue Service. However, for the final payroll in the third quarter for 1975, Harbor Boat withheld federal employment taxes in the amount of $34,688.99 from the wages of its employees, and all of this money was retained by Harbor Boat and used for its own purposes, none being deposited in a government depositary or ultimately paid over to the Internal Revenue Service.

For the fourth calendar quarter of 1975, Harbor Boat's total liability for federal employment taxes withheld from the wages of its employees amounted to $169,167. Of that amount, only $42,274.94 was paid over to the Internal Revenue Service.

For the first calendar quarter of 1976, Harbor Boat's total liability for federal employment taxes withheld from the wages of its employees amounted to $79,771.85. None of this was paid by Harbor Boat to the Internal Revenue Service.

Subsequent collections by the Internal Revenue Service brought Harbor Boat's delinquencies for the three quarters involved in this case down to $259,396.06 for the third quarter of 1975, $122,872.02 for the fourth quarter of 1975, and $63,003.27 for the first quarter of 1976. These amounts were assessed against the plaintiff, and he paid $2,435.25 on them.

For the period from August 13, 1975, through the first calendar quarter of 1976, the plaintiff and his team from Chancellor were in charge of Harbor Boat's finances. Harbor Boat was having financial problems during that period, due principally to difficulties with the *Point Loma* and *Hollister* jobs, which culminated in the termination of those contracts by the Navy because of Harbor Boat's default in performance and insufficiency of financial resources with which to complete the remaining work on the two contracts. Nevertheless, Harbor Boat continued in business through the first calendar quarter of 1976. It had a work force working and generating payrolls throughout the period; it was withholding federal employment taxes from the wages of its employees; but, to the extent previously mentioned, Harbor Boat was not timely depositing these trust funds in a government depositary, as required by law, and ultimately paying them over to the Internal Revenue Service. Instead, Harbor Boat was using the trust funds for other business purposes.

As the Harbor Boat official writing checks on the company's bank accounts after August 13, 1975, the plaintiff was necessarily the company official determining who should be paid among the entities having just claims against Harbor Boat, and who should not be paid. To the extent mentioned previously, the plaintiff determined that the trust money due the Internal Revenue Service should not be paid over to that agency but should be used for other business purposes.

The conclusion is inescapable that the plaintiff has failed to show, by a preponderance of the evidence, that he did not disregard his duties as a responsible official of Harbor Boat, and that he made every reasonable effort to see to it that the trust money would be paid over to the Internal Revenue Service. In other words, the plaintiff has failed to meet his burden of proving the lack of willfulness on his part.

It must be held, therefóre, that the plaintiff was a responsible official of Harbor Boat who willfully failed to account for and

pay over to the Internal Revenue Service federal employment taxes which Harbor Boat had withheld from the wages of its employees.

## CONCLUSION OF LAW

On the basis of the foregoing opinion and the facts found by the court, the court concludes as a matter of law that the plaintiff is not entitled to recover, and that the defendant is entitled to recover on its counterclaim.

Pursuant to Rule 58, the clerk will enter judgment for $442,836.10, plus interest according to law, in favor of the defendant on its counterclaim, and will dismiss the complaint.

IT IS SO ORDERED.

## FINDINGS OF FACT *

1. The plaintiff in this case, Louis A. Farris, Jr., is an individual who, at all relevant times, has resided in Dallas, Dallas County, Texas, and has been married to Barbara Farris.

2. The issue to be decided is whether the plaintiff is liable under section 6672 of the Internal Revenue Code of 1954 for 100 percent penalties in connection with unpaid payroll taxes of Harbor Boat Building Company ("Harbor Boat"). The payroll taxes in question were due for the third and fourth calendar quarters of 1975 and the first calendar quarter of 1976, such taxes having been withheld from the wages of Harbor Boat's employees under 26 U.S.C. §§ 3102(a) and 3402(a) (1976).

3. (a) The Commissioner of Internal Revenue made assessments against the plaintiff as follows:

| Calendar Quarter Ending | Amount of Assessment |
| --- | --- |
| September 30, 1975 | $259,396.06 |
| December 31, 1975 | 122,872.02 |
| March 31, 1976 | 63,003.27 |
| Total | $445,271.35 |

(b) With a minor exception for the first quarter of 1976, these assessments equaled the unpaid payroll tax liabilities of Harbor Boat as of the time of trial.

4. (a) The plaintiff has paid a portion of each assessment against him, in the total amount of $2,435.25, and is suing for a refund.

(b) The defendant, the United States, has counterclaimed for the portion that remains unpaid.

5. (a) Throughout the calendar quarters in issue, the plaintiff was the majority shareholder and chairman of the board of directors of Chancellor Corporation ("Chancellor"), a Dallas, Texas, based company incorporated in 1970. Barbara Farris owned the remaining stock in Chancellor. At a time prior to the period in issue, Chancellor had been known as Chancellor Sciences.

(b) Barbara Farris was corporate secretary of Chancellor, with accounting duties. As of 1975, she had previously had accounting experience with persons unrelated to this litigation, and had nearly completed work on a college degree in accounting.

6. Chancellor was the parent corporation of the following subsidiaries:

(a) Detroit Bolt & Nut ("Detroit"), a Michigan company incorporated in 1974, with its principal place of business in Detroit, Michigan. The business had previously operated under the same name as a division of Whittaker Corporation of Los Angeles, California. The business was acquired in 1974 from Whittaker Corporation by the newly formed subsidiary of Chancellor. The primary business of Detroit was the distribution of automotive parts to the automobile industry.

(b) Harbor Boat, a California company incorporated in 1933, with its principal place of business on Terminal Island at San Pedro, California, south of Los Angeles. The principal business of Harbor Boat was ship construction and repair for the maritime industry, including the United States Navy. In 1975 and 1976, Harbor Boat did business as Harbor Marine Industries.

---

* It is not necessary to print the separate findings of fact in the United States Claims Court Reporter, as the facts are stated sufficiently in the opinion.

(c) Buffalo Electric Company ("Buffalo"), a Texas company incorporated in 1973, with its principal offices in Dallas, Texas. The primary business of Buffalo was the distribution of industrial and commercial electrical supplies. The business was initially founded in 1957, and was acquired by Buffalo in 1973.

(d) Chancellor Sciences, a Texas company incorporated in 1975, with its principal offices in Dallas, Texas.

7. Harbor Boat had been previously owned by several corporations based in Dallas, Texas: LTV Corporation, then Saturn Industries, which changed its name to Tyler Corporation, and then Omega-Alpha Corporation. At least two of these previous owners were publicly owned corporations.

8. Effective March 30, 1973, Chancellor acquired the stock of Harbor Boat from Omega-Alpha Corporation. Chancellor acquired Harbor Boat because of the management of Harbor Boat at the time.

9. At the time when Chancellor acquired Harbor Boat, the management of the latter was as follows:

(a) President—Ron Rados

(b) Vice-President—Mike Iacono

(c) Controller—Theresa Robbins

10. After the acquisition of Harbor Boat by Chancellor, Ron Rados continued in the office of President of Harbor Boat to give the company, which had been in his family since its inception, his guidance. Mike Iacono and Theresa Robbins also continued in the positions they had previously held. Ron Rados had grown up in the business and had been kept on with Harbor Boat by each of the three large corporations that owned it before Chancellor. Mike Iacono had worked at Harbor Boat since he began at age 12 as a carpenter. He knew Harbor Boat's operations intimately, although he did not have an extensive formal education. He worked well with Ron Rados, whom he had known most of his life. Theresa Robbins had also been at Harbor Boat for a number of years.

11. After the acquisition of Harbor Boat by Chancellor, W.D. Rogers, a former mayor of Lubbock, Texas, was installed as chairman of the board at Harbor Boat. However, he left Harbor Boat 6 months later due to the press of other business, and the plaintiff then became chairman of the board. The plaintiff was also a vice-president of Harbor Boat.

12. Chancellor had a corporate policy manual that was provided to each of its subsidiaries. According to its foreword, the manual was "meant to define the operational relationship between Chancellor and its subsidiaries." It further stated that "The operational relationship to be established and maintained by and between Chancellor and its subsidiaries is one of operating autonomy with accountability." This statement was written by Richard L. Thomas, a vice-president and general attorney of Chancellor. As used in the manual, "operating autonomy" was intended to mean that Chancellor did not get into the day-to-day decision-making processes of its subsidiaries, but only in the major decisions; and "accountability" was intended to mean that each subsidiary's operating officers were responsible for their own operations.

13. In 1974, Ron Rados became physically incapacitated, and in August of that year he was given a leave of absence, from which he never returned. In December 1974, Mike Iacona also left Harbor Boat, at least partially as a result of Mr. Rados' departure. At the time of his resignation, Mr. Iacona was Harbor Boat's executive vice-president and was in charge of the company in Ron Rados' absence.

14. In 1974, one of Harbor Boat's vice-presidents was Hugh Murray. He had been employed by Harbor Boat since 1970 in various administrative and executive positions, and had been made vice-president July 31, 1974, upon the recommendation of Ron Rados.

15. Following the departure of Ron Rados and Mike Iacono from Harbor Boat, Hugh Murray became the executive vice-president of Harbor Boat. Upon Hugh Murray's recommendation, Robert E. Apple, a retired naval officer, was hired by the plaintiff as Harbor Boat's president to han-

dle administrative and technical matters. Mr. Apple served in that capacity until June 25, 1975, and then he served as a consultant for 1 month before going out to form his own corporation.

16. (a) Before the departure of Ron Rados and Mike Iacono from Harbor Boat, they were the only two persons with the authority to sign checks for Harbor Boat.

(b) When Ron Rados and Mike Iacono departed, Hugh Murray was given the check-signing authority. Thereafter, until August 13, 1975, Hugh Murray was the only person regularly stationed at Harbor Boat with check-signing authority, and he was the Harbor Boat official who actually signed corporate checks. A facsimile of Hugh Murray's signature was used to sign the payroll checks.

(c) The preparation and disbursement of payroll checks was essentially an automatic computer function, not requiring any affirmative action by any Harbor Boat official. It was done weekly.

(d) Checks for payroll taxes were manually prepared by the accounting department and routinely forwarded to Hugh Murray for manual signing, up until August 13, 1975.

17. After the departure of Messrs. Rados and Iacono from Harbor Boat, the plaintiff and Barbara Farris were on the banks' signatory cards for Harbor Boat, in addition to Hugh Murray. The original intention was that the Farrises would use the check-signing authority only in emergency situations, and they actually used such authority infrequently up until August 13, 1975, in the case of the plaintiff, and throughout Harbor Boat's existence in the case of Barbara Farris.

18. Theresa Robbins was the person at Harbor Boat who was responsible for producing monthly financial statements. These statements were, among other things, the principal documents upon which Chancellor relied to stay informed about the financial condition of Harbor Boat. In the opinion of the plaintiff and Barbara Farris, Theresa Robbins was doing a good job.

Nevertheless, in late 1974, Hugh Murray fired her on his own authority and without obtaining advance approval from anyone. Although the plaintiff and Barbara Farris were not pleased to learn of Theresa Robbins' firing, neither they nor anyone else at Chancellor intervened.

19. Hugh Murray went to an employment agency and obtained resumes on three or four persons who might have the qualifications to become Harbor Boat's new controller; and he interviewed two applicants for the job, a man and a woman. He preferred the woman, whose name was Ann Hipp, because he believed a woman would work better with Barbara Farris at Chancellor. Mr. Murray recommended to the plaintiff and Barbara Farris that Ann Hipp be employed; and she was employed by the Farrises after they had interviewed her. Hugh Murray and Ann Hipp then worked out the details of a written employment contract between Harbor Boat and Ann Hipp. She became Harbor Boat's controller in late November 1974.

20. Since 1969, Harbor Boat had held a Master Contract for Repair and Alteration of Vessels (the "Master Contract") with the U.S. Navy. The Master Contract established the terms upon which Harbor Boat was to effect repairs, completions, and alterations of and additions to naval vessels under job orders issued from time to time by the Navy's contracting officer.

21. (a) In May or June 1974, Harbor Boat submitted the low bid to the Navy to do certain repair work on the U.S.S. *Point Loma*. Harbor Boat was awarded the job order to do the repairs for $3,723,269. Under the terms of the job order, Harbor Boat was to commence work on June 28, 1974, and to complete the work on December 20, 1974.

(b) This job was much larger than any Harbor Boat had ever obtained previously. The total sales of Harbor Boat had been about $2,500,000 in 1972 and $5,000,000 to $6,000,000 in 1973.

(c) On June 29, 1974, the Navy issued, and Harbor Boat agreed to, three bilateral modifications to the job order, which in-

creased Harbor Boat's work and raised the job price by $827,244.

(d) During the course of Harbor Boat's job order performance, the completion date was extended five times, eventually resulting in a June 30, 1975, completion date. Harbor Boat actually performed work under this job order for approximately 425 days, running from the commencement date of June 28, 1974, to August 28, 1975.

(e) During the course of the job order performance, the Navy issued a total of 778 contract modifications to Harbor Boat, which modifications Harbor Boat was contractually required to accept and did accept. Also, during the course of the job order performance, Harbor Boat issued 1,120 Inspection and Discrepancy Reports (I.D.R.'s) to the Navy. These I.D.R.'s were issued under a practice customary within the industry, under which Harbor Boat used I.D.R.'s to report to the Navy on-board conditions encountered in machinery, equipment, and ship structure which required work not covered by the job order specifications. This extra work was then written into the contract by modification, and many of the 778 contract modifications were incorporated as a result of Harbor Boat's I.D.R.'s. Approximately 70 of the contract modifications and changes were issued to Harbor Boat after June 30, 1975. Because of the additional work required by the contract modifications, the job order price was increased to $6,775,244.

22. (a) Clause 6 of the Master Contract provided in part that the Navy "may at any time, by written change order, * * * make changes within the general scope of any job order." The contractor had the right to seek an equitable adjustment in the price or date of completion of the job order, but it was provided that no action by the Navy under Clause 6 "shall excuse the Contractor from proceeding with the job order as changed."

(b) Changes in a job order are customary. However, the normal increase in dollar volume over the term of a job is from a minimum of 10 percent to a maximum of possibly 40 percent. The *Point Loma* con-

tract increased from $3,723,269 to $6,775,-244, an increase of 82 percent.

23. (a) On November 25, 1974, the Navy issued an invitation for bids for the overhaul of the U.S.S. *Hollister*. Harbor Boat submitted the low bid for part of the work (topside repairs) and, as a result, was awarded the job order to do that portion for $1,749,702.

(b) Robert Apple, the president of Harbor Boat, had many years of previous experience with the design, construction, and repair of Navy vessels, both as a naval officer and as a civilian. At the time Harbor Boat bid on the *Hollister* job, it was Mr. Apple's belief that the work on the *Point Loma* job was almost completed. If in fact the *Point Loma* work had declined as the *Hollister* work came on stream, the result would have been a level amount of work for the Harbor Boat work force and facilities to handle. As it actually developed, the continuing high level of work on the *Point Loma,* coupled with the work build-up on the *Hollister,* overloaded Harbor Boat's subcontractors, exhausted the available pool of skilled labor, and increased Harbor Boat's costs by forcing it to use unskilled, inefficient labor.

(c) Under the terms of the job order on the *Hollister,* Harbor Boat was to commence work on March 10, 1975, and to complete the work on June 30, 1975. Harbor Boat actually performed work under this job order from March 10, 1975, to August 28, 1975. During this period, the Navy issued 336 contract modifications. Many of the 336 modifications to the contract incorporated extra work described in 516 I.D.R.'s issued by Harbor Boat to the Navy during the period. Because of the additional work required by the contract modifications, the job order price was increased from $1,749,-702 to $2,788,719, an increase of 59 percent.

(d) During the course of the job order performance, Harbor Boat requested, and the Navy granted, two extensions of the completion date through August 29, 1975. At the time when the contract was terminated by the Navy, Harbor Boat had pend-

ing a request for an extension in the completion date to September 17, 1975.

24. The contract changes mentioned in previous findings were extraordinary, both as to scope and number.

25. On January 29, 1975, auditors from the U.S. Department of Defense reported that they had performed a survey of the financial capability of Harbor Boat to perform on current contracts and qualify for future solicitations of ship repair work. They reported that, in their opinion, Harbor Boat's "financial capability is marginal at this time; however, it is our opinion the contractor will be able to perform on anticipated Government contracts during the near future." Their "acceptance of the company's financial capabilities" was predicated on three assumptions, none of which subsequently proved to be false, with one relatively minor exception: *i.e.*, according to the report, future borrowings by Chancellor could hamper Harbor Boat's financial capability. In Fact, Chancellor did borrow $22,000 from Harbor Boat in May 1975, which it never repaid.

26. When Robert Apple assumed his duties as president of Harbor Boat on January 2, 1975, Harbor Boat's creditors were waiting an average of 90 to 120 days to be paid. By March 1975, the creditors were being paid in 30 to 60 days, and things were really looking good for Harbor Boat. Thereafter, however, Harbor Boat began to experience a cash flow problem, caused principally by the expansion of the *Point Loma* and *Hollister* jobs.

27. After Robert Apple was hired as Harbor Boat's president, one of the first written communications to him from Chancellor was a letter dated February 5, 1975, in which he was instructed that, "On cash flow projections, always provide for payroll, withholding deposits and workmen's compensation insurance premiums *pay first* —this priority system is a must." (Emphasis in original.) He understood that the reference to withholding deposits referred to payroll taxes withheld from employees. Hugh Murray was given a copy of the letter.

28. (a) By letter dated March 10, 1975, Barbara Farris gave similar instructions to Ann Hipp. This letter read in part as follows:

As you know, in your capacity as Controller we depend upon you to see that the priority items are paid first; i.e., payroll and related taxes, workmen's compensation, building rentals, equipment lease payments and, of course, any expenses for which we bill you. These should be treated the same as payroll and paid within the week received by you. As I said, these are priority items and should be taken care of before any other items are considered.

(b) Hugh Murray was aware of these instructions.

(c) The letter also complained that Chancellor was not receiving various financial statements from Harbor, including "copies of the daily cash report which we requesed [sic] January 15, 1975."

29. The following month, Barbara Farris wrote another letter to Ann Hipp concerning Ann's financial reporting to Harbor Boat. This letter, dated April 18, 1975, read in part as follows:

Per three requests and three separate incidences of sending copies of forms, we have asked that you send us a Daily Cash Report. We have had no response as to why you are not sending them and these must be completed immediately and mailed to us daily.

Since the audit is complete, there is no reason why this 15-minutes-a-day job cannot be accomplished. I am enclosing another form just in case you have lost the others and so that there will be no reason why you cannot comply.

If there is any reason, I would appreciate your calling me immediately upon receipt of this memo.

30. (a) Barbara Farris seldom left Dallas to visit Harbor Boat. However, she became sufficiently concerned about the quality and timeliness of the financial statements that in June 1975 she accompanied the plaintiff to Harbor Boat to review the

problem. She found that Harbor Boat's records were not being kept properly. They were incomplete and disheveled. Therefore, she and the plaintiff decided that Ann Hipp should be relieved of her duties as controller, although she was free to remain an employee of Harbor Boat at the same salary under the new controller's supervision. Shortly after being told of this decision, Ann Hipp quit.

(b) Without the approval of the plaintiff or of Barbara Farris, Hugh Murray paid Ann Hipp $5,000 as severance pay under a provision in her employment contract that provided for severance pay if she was terminated without cause with less than 90 days' notice.

31. The plaintiff and Barbara Farris hired a replacement for Ann Hipp at Harbor Boat. They also hired Edward Lovelock to help with certain specific aspects of the accounting work.

32. During the second calendar quarter of 1975, Harbor Boat began to fall behind in its payment of federal employment taxes. The liability for that quarter was $567,464.01, of which only $139,592.51 was timely paid.

33. (a) Harbor Boat prepared general ledger trial balances as of a date near the end of each month. Each monthly financial statement was then prepared from the general ledger trial balance. The federal employment tax liabilities, per the general ledger trial balances, were added together with some other items, and then the total (rounded to the nearest thousand dollars) was included on the financial statement balance sheet as an accrued liability under the heading "Accrued taxes, other than income taxes."

(b) According to the financial statement balance sheets, the outstanding federal payroll tax liabilities (credits) as of approximately the ends of the months of April, May, and June of 1975 were in the respective amounts of ($0.79), $30,471.50, and $20,036.85. As stated in finding 32, however, the actual liabilities were much larger, amounting to $427,871.50 ($567,464.01 total

liability less timely payments of $139,591.51) by the end of June 1975.

(c) Mechanically, the discrepancy occurred because Harbor Boat's books reflected that a liability had been paid as soon as a check to a creditor had been prepared. However, the checks were not in fact released to creditors until they had been signed and released by Hugh Murray. As Harbor Boat's cash flow problem became more acute, Hugh Murray began holding a large number of checks in a credenza behind his desk, including checks for payroll taxes. No adjustments were made to the financial statements to reflect the checks being held.

34. The exact time when the plaintiff learned of the delinquency with respect to the payment of federal employment taxes for the second quarter of 1975, as indicated in finding 32, is not clearly shown by the evidence. It is certain, however, that the plaintiff was aware of this delinquency not later than August 2, 1975.

35. Under Harbor Boat's Master Contract, the Navy was to retain 10 percent of the money otherwise due to Harbor Boat on the *Point Loma* and *Hollister* jobs. Under the Master Contract, those retainages were finally to be paid when each job was completed. However, it is not uncommon for a contractor on jobs of this size to seek and obtain an early release of some retainages as the work progresses. On June 20, 1975, Harbor Boat began seeking the release of some of these retainages to permit the payment of delinquent taxes, principally federal employment taxes for the second quarter of 1975, and otherwise to help alleviate Harbor Boat's cash flow problem.

36. Harbor Boat was contemporaneously seeking bank financing to assist it with its cash flow problem, and appeared to have succeeded in finding a bank willing to provide the financing. The Navy contracting officer and an official from Union Bank in California met and provided each other with assurances that they would do their respective parts to assist Harbor Boat.

37. By July 18, 1975, the Navy contracting officer had been made aware of the fact

that Harbor Boat was delinquent in paying $427,000 on its federal payroll taxes for the second calendar quarter of 1975. Hugh Murray and Edward Lovelock had supplied the information to the Navy. Chancellor personnel was not involved in providing it. However, the plaintiff did become aware, not later than August 2, 1975, that Harbor Boat's principal objective in seeking the release of retainage money was to be able to pay the delinquent federal employment taxes for the second quarter of 1975.

38. The plaintiff had initiated the conversations with the Union Bank and had obtained the bank's oral agreement to provide a $1,000,000 line of credit to Harbor Boat. This line of credit was to be secured by Harbor Boat's accounts receivable and also by $500,000 in cash, which would probably come from the Navy and would be placed in a certificate of deposit with Union Bank. Hugh Murray knew of the negotiations with Union Bank, and the plaintiff thought that Mr. Murray was in total agreement with the financing plan. However, Hugh Murray felt obligated to pay the delinquent federal employment taxes for the second quarter of 1975, and also some delinquent California payroll taxes, with funds released by the Navy.

39. (a) The Navy notified Harbor Boat that it was prepared to release a 5 percent retainage (amounting to approximately $600,000) to Harbor Boat on August 2, 1975. On that date, Hugh Murray traveled to San Diego in order to pick up the Navy check. He took with him two Harbor Boat checks, each dated July 31, 1975. One check was payable to the Internal Revenue Service, was in the amount of $427,871.50, and covered Harbor Boat's federal employment taxes for the second quarter of 1975. The other check was payable to the State of California and covered payroll taxes due that State in the amount of $99,210.78.

(b) When the plaintiff learned on August 2, 1975, in a telephone conversation with Edward Lovelock, who had been placed at Harbor Boat by the plaintiff in July 1975, that Hugh Murray had gone to San Diego for the Navy retainage check and intended to use most of the money for the payment of delinquent taxes, the plaintiff was upset and stated that he did not want Hugh Murray to use the Navy money for the payment of taxes, as he (the plaintiff) intended for the money to be deposited in Union Bank for the purpose of obtaining a line of credit from the bank.

(c) Edward Lovelock got in touch with Hugh Murray in San Diego over the telephone, and told him of the plaintiff's wishes with respect to the Navy money.

(d) Nevertheless, on receiving the retainage check from the Navy, Hugh Murray deposited the check in a Harbor Boat checking account at Bank of America, and immediately mailed to the Internal Revenue Service and to the State of California the checks that had been prepared for them. Hugh Murray knew that he was acting contrary to the plaintiff's expectations in not depositing the money with Union Bank.

(e) When the plaintiff saw Hugh Murray after the August 2, 1975, incident, he reprimanded Hugh Murray for "breaching trust" by using the money from the Navy to pay delinquent taxes instead of depositing the money in Union Bank.

40. (a) After the incident of Hugh Murray's failure to carry out the plaintiff's wishes with respect to the use of the retainage money from the Navy, the plaintiff and other personnel from Chancellor, the parent corporation, became actively involved in supervising the financial affairs of Harbor Boat, and this situation continued as long as Harbor Boat remained in business.

(b) Although Hugh Murray continued in the service of Harbor Boat until sometime in October of 1975, his work for the company after the retainage check incident was devoted principally to the development of claims against the Navy. On August 13, 1975, the plaintiff relieved Hugh Murray of his previous authority and responsibility with respect to financial matters, including the payment of federal employment taxes. After August 13, 1975, Hugh Murray did not manually sign any more checks for the payment of Harbor Boat's business or tax obligations, although a facsimile of his sig-

nature continued to be used for a time on payroll checks.

(c) During the August-December period of 1975, the plaintiff was present at Harbor Boat: on August 12, 13, and 28; on September 4, 9, 10, 11, 16, 23, 24, 25, and 30; on October 7, 8, 9, 15, 21, 22, 23, 28, 29, and 30; on November 4, 5, and 6; and on December 16, 17, and 18. When present, the plaintiff devoted his time principally to the financial affairs of Harbor Boat.

(d) When the plaintiff was absent from Harbor Boat during the period mentioned in paragraph (c) of this finding, he was represented there at practically all times by at least one official from Chancellor.

(e) After August 13, 1975, the plaintiff exercised his check-signing authority for Harbor Boat more frequently than previously had been the case. Indeed, the evidence in the record indicates that only the plaintiff manually signed checks for Harbor Boat after August 13, 1975, although a facsimile of Hugh Murray's signature continued to be used for a time after August 13 on payroll checks to Harbor Boat's employees.

41. (a) In the 2 or 3 weeks immediately following the August 2, 1975, incident relative to the disposition of the Navy retainage check, a review of Harbor Boat's financial records was made by Chancellor personnel. At that time, Harbor Boat was delinquent with respect to federal employment taxes for the third calendar quarter of 1975. For the payrolls of the third quarter, up to and including the payroll of August 10, 1975, Harbor Boat had withheld federal employment taxes in the total amount of $272,047.14 from the wages of its employees. However, all of this tax money had been retained by Harbor Boat and used for its own purposes. None of it had been deposited in a government depositary, and none of it was ever paid over to the Internal Revenue Service.

(b) With respect to Harbor Boat's next five payrolls, following the August 10 payroll and extending through the September 14 payroll, all funds which Harbor Boat withheld from the wages of its employees for federal employment taxes were properly deposited in a government depositary and were ultimately paid over to the Internal Revenue Service.

(c) For the final payroll in the third quarter of 1975, Harbor Boat withheld federal employment taxes in the amount of $34,688.99 from the wages of its employees. All of this money was retained by Harbor Boat and used for its own purposes, and none of it was deposited in a government depositary or ultimately paid over to the Internal Revenue Service.

42. (a) At 3:00 p.m. on August 27, 1975, Richard Thomas (a member of the Chancellor group mentioned in finding 40) and Edward Lovelock met with Betty Dill, the Navy's contracting officer, in an effort to obtain further assistance from the Navy to ease Harbor's cash flow problem. Betty Dill stated that as it was late in the day, no decision would be made at that time, but that she would take the matter under consideration and discuss it with them the next morning. Mr. Thomas indicated that the plaintiff would be flying out to California from the corporate office in Dallas and would be available the next afternoon.

(b) The following morning, August 28, 1975, Hugh Murray and Edward Lovelock met again with Betty Dill and her assistant, essentially for the same purpose. At this meeting, the Harbor Boat representatives disclosed to Betty Dill that an Internal Revenue Service representative had been in their place the previous day and had placed them on Notice of Compliance, which meant they must pay the withholding tax on a weekly basis; that they had made payment of $41,000 on that day; and that they would have to meet the tax commitment in another week, which would be the same sum or less, depending on the payroll. They further disclosed that Harbor Boat was still not current in paying its payroll taxes, and that the unpaid liability then amounted to about $200,000. Betty Dill was surprised to learn this information, and instructed Hugh Murray that the plaintiff should be informed about the outstanding third quarter taxes.

(c) On the evening of August 28, 1975, another meeting was held in Betty Dill's office. The plaintiff, Richard Thomas, Hugh Murray, and Edward Lovelock were there, together with four Navy representatives. At that meeting, Betty Dill served two written notices of termination upon Harbor Boat. The notices stated that they constituted decisions by the Navy that Harbor Boat was in default in performing its contracts on the *Point Loma* and the *Hollister*. The stated reasons were Harbor Boat's lack of progress on the contracts and inability to prove financial resources with which to complete the remaining work. Therefore, Harbor Boat's right to proceed further with performance of the contracts was terminated.

43. The Navy is not contractually required to allow a cure period before a termination is effective, but it usually does allow a 10-day period. No cure period was allowed in regard to the *Point Loma* or the *Hollister* contract. The terminations were completely unexpected by the Harbor Boat personnel. At the time of the terminations, the contract work, as certified by the Navy, was 92 percent complete on the *Point Loma* and 95 percent complete on the *Hollister*. Immediately following the terminations, Hugh Murray laid off almost 200 employees at Harbor.

44. On September 25, 1975, Hugh Murray resigned as executive vice-president of Harbor Boat. On that date, he notified the banks at which Harbor Boat maintained checking accounts that he was no longer to have signatory authority on the accounts. He continued as an employee of Harbor Boat until the last week in October 1975.

45. (a) After Hugh Murray left Harbor Boat, Edward Lovelock paid creditors by releasing checks previously written and by using cashier's checks, primarily for payroll. The plaintiff signed some checks in this time period.

(b) During this time period, Harbor Boat's creditors were beginning to take legal action to tie up Harbor Boat's accounts receivable and bank accounts. When a check was released, it frequently did not clear the bank. The accounts receivable were also encumbered, as they had been previously pledged as security for a $400,000 line of bank credit.

46. (a) On November 6, 1975, the plaintiff and Edward Lovelock met with two representatives of the Internal Revenue Service in regard to Harbor Boat's unpaid tax liability. At this meeting, Harbor Boat proposed to pay off its delinquent third quarter payroll tax liabilities at the rate of $55,000 per month for 6 months, commencing January 2, 1976. This proposal was submitted by the Internal Revenue Service representatives to their supervisor; and, after he approved it, the proposal was reduced to writing in the form of a letter dated November 26, 1975, and signed by the plaintiff as vice-president of Harbor Boat. Pursuant to the proposal, Harbor Boat presented six appropriately postdated checks to the Internal Revenue Service, in the amount of $55,000 each.

47. On November 26, 1975, Harbor Boat gave the Internal Revenue Service a check in payment of the fourth quarter 1975 tax liabilities, in the amount of $99,818.16. However, due to the actions of Harbor Boat's creditors against its bank accounts, the check failed to clear the bank.

48. As a condition of the agreement with the Internal Revenue Service, Harbor Boat was to make all weekly deposits on a timely basis. Harbor Boat attempted to comply with that condition. It made timely deposits for 3 weeks, commencing December 5, 1975. However, Harbor Boat's cash flow problems became even more critical during this time. Additional creditors tied up the bank accounts, an anticipated line of bank financing failed to materialize, laid-off employees stole assets, and the State of California put a keeper on the premises to collect whatever funds he could from customers coming to get their repaired boats. Also, the Navy and the Coast Guard started to withhold payment on work (other than work on the *Point Loma* and on the *Hollister*) that Harbor Boat had done. In January and February, 1976, the Internal Revenue Service tried to cash the first two of

the postdated $55,000 checks, but both failed to clear the bank.

49. (a) For the fourth calendar quarter of 1975, Harbor Boat's total liability for payroll taxes was $169,167. Of that amount, $42,274.94 was paid timely by three December deposits.

(b) For the first calendar quarter of 1976, Harbor Boat's total liability for payroll taxes was $79,771.85, none of which was timely paid.

(c) Subsequent collections by the Internal Revenue Service brought the totals down to approximately the amounts in issue in this case.

50. Harbor Boat's federal employment tax returns were prepared and signed in California.

51. In 1976, subsequent to the end of the first calendar quarter, some of Harbor Boat's creditors filed a petition to have Harbor Boat adjudicated a bankrupt. Ultimately, Harbor Boat was in fact adjudicated a bankrupt and was dissolved.

52. Before the bankruptcy, Harbor Boat had pursued its claims against the Navy for wrongful termination of the two ship repair contracts. When Harbor Boat failed to obtain relief from the Navy, Harbor Boat filed complaints with the Armed Services Board of Contract Appeals. However, when Harbor Boat was in bankruptcy, it ran out of money to pursue the claims, which were then abandoned by order of the bankruptcy court.

53. (a) The plaintiff was a person required to collect, truthfully account for, and pay over federal employment taxes on behalf of Harbor Boat.

(b) The plaintiff willfully failed to account truthfully for and pay over such taxes with respect to the third and fourth calendar quarters of 1975 and the first calendar quarter of 1976.